LAWRENCE BELSKY ET AL., APPELLANTS, V. COUNTY OF DODGE ET AL., APPELLEES.

369 N.W.2d 46

Filed May 31, 1985.   No. 83-870.

Hurt, Gallant & Flores, for appellants.

Dean Skokan, Dodge County Attorney, for appellees.

BOSLAUGH, HASTINGS, CAPORALE, and SHANAHAN, JJ., and COLWELL, D.J., Retired.

SHANAHAN, J.

In the district court for Dodge County, Lawrence and Marie Belsky (Belsky), owners of an 80-acre farm (south half of the southeast quarter of Section 27, Township 20 North, Range 5 East of the 6th P.M.), requested an injunction against the County of Dodge, the county's supervisors and highway superintendent, and Webster Township to prevent obstruction of drainage from Belsky's farm. Belsky's son, Larry, and his wife, Kathleen, own an 80-acre farm (north half of the northeast quarter of Section 34, Township 20 North, Range 5 East of the 6th P.M.), south of the farm owned by Lawrence and Marie. The farms owned by the Belsky families are separated by an east-west county road. On the east side of Belsky's farm is a north-south township road. Pebble Creek is a drainway running generally northeasterly through Belsky's farm. The source of water for Pebble Creek is rain and melted snow, but the creek is dry approximately 90 percent of the time. The outlet for Pebble Creek is undisclosed.

Land on both sides of the township road is devoted to agriculture. Before 1979, area drainage collected in a depression near the southeast corner of Belsky's farm, approximately 300 to 400 feet south of the bridge for the township road. The collected water drained eastward across the road and rendered it impassable much of the time. Belsky complained to Dodge County about drainage from his farm and the intermittent water problem on the township road. Dodge County, in 1979, undertook extensive grade work on the road and built a new bridge across Pebble Creek. In connection with the county's project to remedy the drainage problem, Belsky indicated he would take the bow out of Pebble Creek across his farm to provide more direct flow from the county road bridge to the location of the new bridge.

Before the 1979 project, fields immediately adjacent to the road had an elevation the same as the road. The opening beneath the old bridge on the township road was 105 square feet, although the greater part of such opening was clogged with debris.

The new bridge's opening is 313 square feet. This new bridge did not intercept Pebble Creek at a right angle. Rather, contemplating Belsky's straightening the creek, the county constructed its new bridge in a northwesterly-southeasterly direction so that an oblique angle was formed as the bridge crossed Pebble Creek. In this manner water in Pebble Creek, after removal of the creek bow by Belsky, would flow perpendicular to the opening beneath the new bridge for direct and unobstructed passage. In constructing the new bridge with its larger opening for passage of water, the county elevated the bridge approach of the road 2.4 feet. This increased elevation caused previously eastward draining water to run north on the west side of the road and then into Pebble Creek at the site of the new bridge. Additionally, after the increased road elevation, water collects on Sections 26 and 27 at an identical level on both sides of the road. Belsky never straightened the bow of Pebble Creek as it crossed his farm.

Belsky filed suit, asserting that the defendants by "negligent, wrongful and unlawful acts" have caused irreparable injury, namely, the opening beneath the new bridge was insufficient for

passage of water in a watercourse and the postconstruction elevation of the township road obstructed a natural drainway, resulting in flooding and standing water on Belsky's farm. Belsky prayed for restoration of drainage as such existed before the 1979 bridge-road construction. On the other hand, Dodge County contends that water had drained across the previous township road because the debris-clogged opening under the old bridge was insufficient for passage of Pebble Creek and caused the creek to back up and drain across the old road. The county also contends that design of the bridge was modified in the light of Belsky's assurance that he would straighten Pebble Creek across his farm and that Belsky's failure to do so bars equitable relief.

At trial all expert witnesses agreed that the increased elevation of the township road may contribute to an increased depth and duration of standing water.

Belsky's expert witness testified that the opening under the new bridge is inadequate to accommodate area drainage in the event of a 50-year storm. A 50-year storm has a 2-percent chance of occurring in any given year. In the opinion of Belsky's expert, a bridge opening of 427 square feet was necessary for adequate drainage from a 50-year storm. To obtain an opening of 427 square feet, it would be necessary to raise the new bridge another 2 feet above its present elevation or dredge a deeper channel for Pebble Creek beneath the new bridge.

An expert witness for Belsky also testified that water would be found on both sides of the road, that is, on Sections 26 and 27, even if there had been no road separating the sections; that the new road did not create backwater on section 34; and that there would be standing water on Section 27 irrespective of the county's "improvements."

The new bridge was constructed to handle runoff from a 25-year storm. A 25-year storm has a 4-percent chance of occurring in any given year. The 25-year standard is widely utilized by state and public subdivisions in bridge design and construction. The new bridge's capacity for passage of water is greater than the capacity of the county road bridge located south of the new bridge and upstream on Pebble Creek. Water will leave Pebble Creek somewhere south of the new bridge

before there is any obstruction to the creek as it flows toward and passes beneath the new bridge. Overbank flows of Pebble Creek can be expected at 1.4- to 2.5-year frequencies and will move in a northeasterly direction parallel to Pebble Creek. These overbank flows eventually leave Belsky's farm by way of the creek channel under the new bridge. On account of the increased capacity for drainage beneath the new bridge, the road-bridge project has improved area drainage, including drainage from Belsky's farm.

The county's expert testified that previous drainage had flowed easily across the old road because the maintained road was capable of conducting a greater flow of water than would be conveyed by agricultural land on either side of the road. As explained by such expert witness, more water was conducted by the old road than by the adjacent cultivated fields because crops in the fields caused a "retardance" to flow, whereas the maintained road, due to an absence of surface obstruction such as vegetation or crops, permitted a greater conveyance of water over the road's surface.

Apart from Pebble Creek, there was no evidence concerning existence or location of a natural drainway for Belsky's farm before installation of a road.

The district court found that Belsky had failed to prove negligence or the existence of a watercourse and dismissed Belsky's action.

For assignments of error Belsky claims the district court erred (1) in determining a statutory watercourse did not exist; (2) in applying the common enemy rule regarding surface waters; and (3) in finding that the county had provided for sufficient passage of all waters reasonably anticipated to flow beneath the new bridge placed in a natural drainway.

Since this is an action in equity, we review the matter de novo without reference to findings of fact made by the trial court. *Barry v. Wittmersehouse*, 212 Neb. 909, 327 N.W.2d 33 (1982); *Jameson v. Nelson*, 211 Neb. 259, 318 N.W.2d 259 (1982). Where testimony or evidence is in conflict, we take into account that the trial court observed the witnesses. *Barry v. Wittmersehouse, supra*. A party seeking an injunction must establish by competent evidence every controverted fact

necessary to entitle the claimant to relief. *Grint v. Hart*, 216 Neb. 406, 343 N.W.2d 921 (1984). Our review of the record and disposition of this matter is governed accordingly.

Without becoming swamped by or bogged down in terminology, nevertheless we are reminded that applicable to this case are certain definitions and characteristics of distinctive waterways.

Regarding Belsky's claim that he is entitled to relief due to the county's obstruction of Pebble Creek as a statutory "watercourse," there is a double deficiency in Belsky's proof. A watercourse is defined or characterized by Neb. Rev. Stat. § 31-202 (Reissue 1984): "Any depression or draw two feet below the surrounding lands and having a continuous outlet to a stream of water, or river or brook shall be deemed a watercourse." Belsky adduced no evidence regarding the depth of any "depression or draw," and no proof of any continuous outlet to a stream, river, or brook. The destination of Pebble Creek is undisclosed. Absence of such evidence precludes any finding that Pebble Creek is a watercourse within § 31-202. We conclude that there is no statutory watercourse involved in the case before us.

Although Belsky refers to "flooding," this case does not involve floodwaters—waters that spill over banks of a stream during high water, flow over adjacent lands in the stream's flood plain, and return to the stream at a point or points downstream. See *Wiese v. Klassen*, 177 Neb. 496, 129 N.W.2d 527 (1964). Pebble Creek is not a watercourse and, therefore, any over-the-bank waters from the creek are not floodwaters.

Rather, it appears to us that waters involved in this case are characterized as surface waters. "Surface waters are waters which appear upon the surface of the ground in a diffused state, with no permanent source of supply or regular course, which ordinarily result from rainfall or melting snow." *Kuta v. Flynn*, 182 Neb. 479, 481, 155 N.W.2d 795, 797 (1968); *Sullivan v. Hoffman*, 207 Neb. 166, 296 N.W.2d 707 (1980).

In his claim that the county has obstructed a natural drainway located south of the new bridge, Belsky relies on *Nichol v. Yocum*, 173 Neb. 298, 113 N.W.2d 195 (1962). In *Nichol* this court rejected categorical application of the

"common enemy" doctrine regarding surface waters and adopted the doctrine of the "common law" as controlling in Nebraska. In *Nichol* this court stated:

> [D]iffused surface waters may be dammed, diverted, or otherwise repelled, if necessary, and in the absence of negligence. But when diffused surface waters are concentrated in volume and velocity and flow into a natural depression, draw, swale, or other drainway, the rule as to diffused surface waters does not apply. . . . "[A] natural drainway must be kept open to carry the water into the streams, and as against the rights of the upper proprietor, the lower proprietor cannot obstruct surface water when it has found its way to and is running in a natural drainage channel or depression. Thus, it has been held that it is the duty of a lower landowner who builds a structure across a natural drainway to provide for the natural passage through such obstruction of all the water which may be reasonably anticipated to drain therein, and that this is a continuing duty."

> At common law the right to drain surface waters into depressions, draws, swales, and drainways which existed in the state of nature was recognized. Lower lands are, at common law, under a natural servitude to receive the surface water of higher lands flowing along natural depressions on the surface of the ground. This is so, whether or not a live watercourse occupies the natural course. . . .

>  . . . .

> This court has recognized the right of an upper proprietor to drain surface waters through a well-defined natural course, whether the course be ditch, swale, or drain in its primitive condition, and that such flow cannot be arrested or interfered with to the injury of neighboring proprietors.

*Nichol v. Yocum, supra* at 306-08, 113 N.W.2d at 200-01.

To prevail on the theory that the altered road obstructed a natural drainway, Belsky must prove by a preponderance of the evidence that a drainway: (1) traversed the township road before the county's alteration; (2) was formed and existed in a

state of nature; and (3) carried water from a higher to a lower estate.

The crucial question is whether a natural drainway existed for water moving north and east across the township road before the county's bridge-road project in 1979.

Although the evidence indicates that water historically had flowed northeasterly across the road, there is no evidence that there was a natural depression, draw, swale, or other drainway existing as a result of natural forces or conditions. The general area, including Section 27, may be characterized by an absence of discernible higher and lower (dominant and servient) estates. After the county's construction in 1979, water having the same level collects on both sides of the road. This indicates that the road was not an element of Belsky's water problem, as borne out by Belsky's expert.

To paraphrase and summarize testimony of expert witnesses: Subject to the law of gravity, water generally follows a line of least resistance. Vegetation on agricultural land offers obstruction, and, therefore, resistance, to flowing water, while a maintained road surface presents no such obstruction. Hence, water tends to flow over an unobstructed road surface rather than a vegetated surface on an adjoining field, when the two surfaces are of equal elevation.

Although Belsky claims a "natural drainway" crossed the township road somewhere south of the new bridge, the very existence of the township road, as an integral but artificial component of the drainway, prevents characterizing any traversing drainway as one existing in a state of nature. Water crossed the road due to diminished resistance of the flat, unobstructed roadway and the obstructed passage under the old bridge. There is no evidence that water, previously flowing northeasterly, would have collected in a state of nature and flowed across the area where the township road is located. Drainage of Belsky's farm resulted from the road's surface and was not attributable to characteristics of land in a natural state.

This is not to say that every artificial element involved in a drainway destroys characterization of the drainway as natural or in a state of nature, but, as in this case, where an essential part of the drainway is artificial or man made, such quality

precludes a natural drainway. As the face of nature becomes less recognizable due to artificial elements injected by man, such reconstruction affecting drainage of diffused surface water may necessitate formulation of rules based on reasonable use instead of rights and duties "referenced to a 'state of nature.' " See R. Harnsberger & N. Thorson, Nebraska Water Law & Administration § 4.09 at 173 (1984). However, so long as Nebraska adheres to the requirement that a drainway be impressed upon the land by nature, a conduit involving an artificial component such as exists in the present case cannot qualify as a natural drainway.

Although there is no natural drainway crossing the road south of the new bridge, and although no watercourse exists in this case, the south fork of Pebble Creek is a natural drainway within the rule prescribed in *Nichol v. Yocum*, 173 Neb. 298, 113 N.W.2d 195 (1962), namely, a drainway which has been formed and exists in a state of nature and carries water from a higher to a lower estate.

The flow of surface waters in any well-defined course, whether it be a ditch, swale, or draw in its primitive condition, and whether or not it is 2 feet below the surrounding land, cannot be interfered with or arrested to the injury of a neighboring proprietor. *Town of Everett v. Teigeler*, 162 Neb. 769, 77 N.W.2d 467 (1956). There may be occasions when surface waters are concentrated in force and volume in a natural drainway, other than a "watercourse," so that rules relating to diffused surface waters, as a common enemy, do not apply. See *Nichol v. Yocum, supra*. A natural drainway must be kept open to carry water into streams, and, as against the rights of an upper proprietor, a lower proprietor cannot obstruct surface water which has found its way into and is moving in a natural drainage channel or depression. *Id*. Thus, in Nebraska water law a watercourse is a drainway, but the converse is not necessarily true. The fact that Pebble Creek is not a watercourse is irrelevant in determining whether Pebble Creek is a natural drainway.

The county constructed the bridge across a natural drainway, and one building a structure across a natural drainway has a continuing duty to provide natural passage for water

reasonably anticipated to move in the drainway occupied by the obstruction. See *McGill v. Card-Adams Co.*, 154 Neb. 332, 47 N.W.2d 912 (1951); cf., *Fellows v. Buffalo County*, 181 Neb. 269, 147 N.W.2d 801 (1967); *Wilson Concrete Co. v. County of Sarpy*, 189 Neb. 312, 202 N.W.2d 507 (1972). Such duty to refrain from structural obstruction of a natural drainway is imposed upon private proprietors and public authorities as well. See *Purdy v. County of Madison*, 156 Neb. 212, 55 N.W.2d 617 (1952).

"Failure to make proper provision for the flow of water under a bridge or culvert has been held to impose liability, although such bridge or culvert may be constructed according to approved principles of engineering; the fact that it does materially obstruct the flow being held to be in itself evidence that it was not properly constructed, regardless of the principles upon which it was built."

*Gledhill v. State*, 123 Neb. 726, 730-31, 243 N.W. 909, 912 (1932). See, also, *Schmutte v. State*, 147 Neb. 193, 22 N.W.2d 691 (1946).

The new bridge was constructed to provide passage for runoff from a 25-year storm. The 25-year storm standard is commonly utilized by the state and counties in bridge construction. Such compliance with a common standard does not exonerate the county from liability. The commonly accepted standard must be viewed with the new bridge's hydraulic capacity, which is greater than the capacity of the upstream county road bridge and that of the channel traversed by the new bridge.

Regardless of the theory for imposition of liability for obstructing a drainway, to impose liability a structure must obstruct water moving in the drainway. The evidence demonstrates that out-of-bank flows may be expected on Pebble Creek at frequencies of 1.4 to 2.5 years. Out-of-bank flows move in a northeasterly direction, generally parallel to Pebble Creek, until flow reaches the roadbed and is directed northward toward the site of the new bridge where flow passed beneath the bridge because the new bridge's capacity is not reached. Overbank flows occur upstream before water reaches any impediment or obstruction caused by the bridge. *Cause* is

defined as "that which produces an effect, result, or consequence." The American Heritage Dictionary of the English Language 214 (1981). See, also, Webster's New Universal Unabridged Dictionary 288 (2d ed. 1983). We find there is no causal relationship between the hydraulic capacity of the new bridge and any water problem on Belsky's farm. This compels our conclusion that there is no liability on the part of the county.

In view of our determinations we do not have to adddress the contention of the county that Belsky's failure to carry out his promise to straighten Pebble Creek precludes equitable relief.

AFFIRMED.