MARVIN HUGHES AND DOROTHY HUGHES, HUSBAND AND WIFE, APPELLANTS, V. ENTERPRISE IRRIGATION DISTRICT, APPELLEE.

410 N.W.2d 494

Filed August 14, 1987.    No. 85-746.

R.L. Gilbert of Gilbert Law Offices, P.C., for appellants.

James R. Hancock of Hancock & Denton, and Robert G. Simmons, Jr., of Wright, Simmons & Selzer, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

SHANAHAN, J.

Marvin and Dorothy Hughes (Hughes) sued Enterprise Irrigation District in the district court for Scotts Bluff County and sought an injunction and damages regarding Enterprise's dam constructed in the North Platte River. In their petition, Hughes alleged ownership of their real estate adjacent to the North Platte River, Enterprise's existence as a political subdivision of the State of Nebraska, and Enterprise's construction of its dam, which prevented adequate "passage of all water, ice and debris" in the river, resulting in overflow, which caused damage to Hughes' crops and real estate. Hughes then alleged prospective and continued overflow, and requested removal of the dam obstruction and assessment of damages.

Hughes had filed, and Enterprise rejected, a tort claim against Enterprise for damages. See Neb. Rev. Stat. §§ 23-2401 et seq. (Reissue 1983) (Political Subdivisions Tort Claims Act). According to the order entered on the pretrial conference, the issue involved in this litigation related to injunctive relief and damages caused by Enterprise's structure in the river.

## LOCATION OF THE FARM AND DAM

Hughes owns a farm which includes 79 acres of cropland abutting the North Platte River. The north bank of the river, which flows from west to east, is the southern boundary of the Hughes farm. A bridge for Highway 226, which runs in a north-south direction, bisects the Hughes farm and crosses the river. At the southeast corner of the Hughes tract and approximately 1,400 feet east of the highway bridge, Enterprise constructed its dam to divert water to the area within the irrigation district.

The cement base of Enterprise's diversion dam ran from bank to bank of the river, a distance of 260 feet. Steel piers, 8 feet apart, were placed in the concrete base and supported wooden planks placed lengthwise against the piers on the upstream side for diversion of the river. The dam, from riverbed to top, was approximately 30 inches high. Toward the dam's north end, at its juncture with the river's north bank, was a headgate which, when opened, permitted water to be diverted into a canal for transportation to the irrigated acres served by Enterprise.

The river had a history of seasonal high water. Excess snowmelt and rainfall, impounded and then released from several upstream reservoirs, contributed to spring and summer flooding of Hughes' farm. In one form or another, Enterprise's diversion dam has existed in the river since the turn of the century. However, regarding overflow in 1983 and 1984, there is no evidence of any antecedent causal relationship between such previous flooding and any structure in the river near the Hughes farm.

## INUNDATION IN 1983 AND 1984

In April 1983, the river's flow began to increase and eventually reached 5,500 cubic feet per second (cfs) at a point west of the highway bridge, where the river overflowed its north bank and flooded part of Hughes' farm. At the point of overflow, the river's flow persistently exceeded 5,500 cfs from the spring of 1983 until the fall of that year.

According to Marvin Hughes, in the spring of 1983 the river's overflow inundated his land west of the highway, resulting in standing water, with a depth of 1 foot, covering part of the cropland and a "muddy" condition on the remaining cropland west of the highway. Such condition existed until September 1983. Hughes' land east of the highway became unusable on account of a condition which Hughes attributed to "seepage," that is, water had "come up from underneath" the land's surface and created a damp condition, which existed until disappearance of the overflow on the land west of the highway. The same patterns and conditions recurred in 1984 whenever the river's flow reached 5,500 cfs in the bridge-dam area.

Hughes claimed that Enterprise's diversion dam caused the

river to back up, resulting in the river's overflow onto Hughes' farm. Enterprise denied that its conduct or structure caused any damage to Hughes. Therefore, the crucial and dispositive question is: Did Enterprise's diversion dam cause the overflow?

## THE EXPERTS

Hughes called John Baker, a civil engineer, as an expert witness to testify about the cause of the river's overflow. Baker had prepared two "water surface profiles" of the river. One profile was prepared for 1983 when the river's flow was 5,500 cfs; the other for 1984 when the flow was 1,200 cfs. Measurements were taken 500 feet downstream from Enterprise's diversion dam and 2,000 feet upstream from that structure. For the stretch of the river from west of the highway bridge to Enterprise's dam, the riverbed had a natural slope of 6.6 feet per mile. Taking into account the various elevations and other measurements, such as the river's depth and rate of flow at the flood site, Baker concluded that the river, in the absence of Enterprise's dam, could have accommodated an additional depth of $2\frac{1}{2}$ to 3 feet before reaching 5,500 cfs and running over its north bank. However, with the dam as an obstruction raising the level of the river, the additional water backed up to the point of overflow west of the highway bridge. Therefore, according to Baker, Enterprise's dam caused inundation of Hughes' land west of the highway and the presence of water on the land east of the highway.

Enterprise called an expert witness, Meredith Schaff, a consulting engineer who was familiar with the river and its flood problems. Schaff's experience included work for the Corps of Engineers and cities along the river. Schaff disputed Baker's method and computations. Referring to Baker's 1983 river profile, Schaff testified that the profile "really shows . . . that there's so much water flowing down the stream and the water's going over the top of the [dam which] actually has no damming effect." To buttress his position, Schaff then referred to Baker's 1984 river profile, when the river's flow was 1,200 cfs. At the diversion dam, with the depth of the river increased by the obstruction, the water backed up "less than 150" feet before the water which had accumulated at the dam flowed over the top of the dam. Under such circumstances, the

diversion dam was merely a "spillway" over which the river flowed without affecting any upstream depth and, consequently, did not affect the river's flow or depth at the point of overflow onto Hughes' land. Thus, Schaff concluded that Enterprise's diversion dam was not a cause of any water problem, whether inundation or seepage, on Hughes' land.

The district court specifically found that any overflow was "not proximately caused by [Enterprise's] diversion structure," found generally in favor of Enterprise on "all causes of action," and dismissed Hughes' petition.

Hughes has raised several assignments of error, but each is an aspect of the basic contention that the district court erred in its finding that Enterprise, by its diversion dam, did not cause damage to Hughes.

## STANDARDS OF REVIEW
### Equity Actions

In an appeal of an equity action, the Supreme Court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided, where credible evidence is in conflict on a material issue of fact, the Supreme Court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. See, Neb. Rev. Stat. § 25-1925 (Reissue 1985); *Newton v. Brown*, 222 Neb. 605, 386 N.W.2d 424 (1986).

### Tort Claims Against a Political Subdivision

"A district court's factual findings in a case brought under the Political Subdivisions Tort Claims Act will not be set aside unless such findings are clearly incorrect." *Lynn v. Metropolitan Utilities Dist.*, 225 Neb. 121, 125, 403 N.W.2d 335, 338 (1987).

### INJUNCTIVE RELIEF

"A party seeking an injunction must establish by competent evidence every controverted fact necessary to entitle the claimant to relief." *Belsky v. County of Dodge*, 220 Neb. 76, 80-81, 369 N.W.2d 46, 51 (1985). "*Cause* is defined as 'that which produced an effect, result, or consequence.' " (Emphasis in original.) *Belsky v. County of Dodge, supra* at 85-86, 369 N.W.2d at 53. " ' "The defendant's conduct is a cause of the

event if the event would not have occurred but for that conduct; conversely, the defendant's conduct is not a cause of the event, if the event would have occurred without it." ' " *Greening v. School Dist. of Millard*, 223 Neb. 729, 735, 393 N.W.2d 51, 57 (1986). By a preponderance of the evidence, one seeking injunctive relief must establish that the defendant's conduct to be enjoined is a proximate cause of the damage claimed. See, *Belsky v. County of Dodge, supra; Steffen v. County of Cuming*, 195 Neb. 442, 238 N.W.2d 890 (1976).

Although both expert witnesses offered quite contrasting opinions regarding the role of Enterprise's diversion dam in relation to the river's overflow, we reach the same conclusion as that of the district court, namely, Hughes has failed to prove Enterprise's conduct or structure caused the water damage. Evidence presented a history of high water and seasonal inundation of land adjacent to the river, a longtime circumstance without previous causal correlation to Enterprise's diversion dam. Further, according to Enterprise's expert witness, the river profiles demonstrate that the diversion dam was incapable of containing the river's flow at the depth necessary to result in the river's backing up to the point of overflow west of the highway bridge. We find it is more likely that the river would spill over the diversion dam with its height of 30 inches before any obstructed water would back up to a point more than 1,400 feet west of the dam and at that point overflow the river's north bank. Having observed the experts during their testimony, the district court apparently reached that same conclusion about causation, namely, the explanation offered by Enterprise is more credible under the circumstances.

Regarding Hughes' tort claim against Enterprise, we cannot conclude that the district court's finding is clearly incorrect, especially in view of Hughes' failure of proof concerning causation.

In reference to any other cause of action, including a claim pursuant to Neb. Const. art. I, § 21, Hughes failed to prove the cause-and-effect relationship between Enterprise's conduct and damage to Hughes.

AFFIRMED.