DONALD J. GRUBER, APPELLANT, V. COUNTY OF DAWSON, NEBRASKA, APPELLEE.

439 N.W.2d 446

Filed May 5, 1989.   No. 87-392.

Willard Weinhold, of Weber & Weinhold Law Office, for appellant.

Barbara J. Koperski, Deputy Dawson County Attorney, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

Plaintiff-appellant, Donald J. Gruber, brought this action against defendant-appellee, County of Dawson, to obtain relief from the pooling of water on his property allegedly resulting from the county's paving of the road adjoining his land. The district court dismissed plaintiff's petition, which seeks to enjoin the county "from obstructing the natural drainage" of water from his property and from negligently repelling surface waters emanating from said property. Plaintiff's five assignments of error may be summarized as asserting the district court erred in finding he failed to sustain his burden of proof and in thus concluding he is not entitled to the injunctive relief he seeks. We reverse and remand with direction.

Plaintiff owns a quarter section of land located in Dawson County. Plaintiff's father farmed the land from 1933 to 1957, at which time plaintiff began to farm it. The property is abutted on the north by a county road and on the west by Highway 21.

Rough, hilly pastureland lies to the south and west of the property, which property is crossed by two canals. The "Orchard and Alfalfa Canal" traverses the northeast corner of the property. The "30 Mile Canal" runs across the southern end of the property. A farmyard, on which various buildings are situated, is located at the northeast corner of the property. A cattle pasture lies directly south of the farmyard.

Two areas of drainage exist on the property. The first consists of water draining off hills and canyons located to the west and south of the property. At least since 1933, these waters entered the property from under a bridge located across Highway 21 and about halfway up the western border of the property and through a visible natural ditch, swale, or depression 4 to 5 feet deep and 5 to 8 feet wide. This natural depression carried the water from the point it entered the property northeast across the land to another bridge located on the county road at about the midpoint of the northern border of the property. The natural depression became shallower as it approached the county road bridge.

In the late 1940s, the father leveled and smoothed the south half of the property. At that time, he also eliminated the natural depression that had carried the water northeasterly between the two bridges, and installed a manmade ditch, 3 feet deep and 25 feet wide, to replace it. Water still entered the property under the highway bridge, but the manmade ditch changed the drainage so that water traveled due north along the western edge of the property to the county road and turned and traveled east along the south side of the road until reaching the county road bridge through which the natural depression had drained. Until the road was paved, both before and after construction of the manmade ditch, water either flowed under the county road bridge or crossed over the top of the road in the northeast corner of the property, where the road was the lowest. Plaintiff testified that water crossed the road almost every year—according to him, the ditch south of the road was "so shallow that it didn't take a lot of water to force it across the road."

The second area of drainage on the property consists of precipitation waters which fall upon the property. The father

testified that both before and after he leveled his land, surface waters from precipitation generally drained across the property to the northeast and eventually entered the ditch to the south of the county road, joining the waters from the manmade ditch.

Before the county road was paved, water which crossed over the road to the north would flow northeast across farmland and eventually enter the Orchard and Alfalfa Canal, which carried the water into the Platte River. In the event the canal overflowed, the water drained east into a "Tri One-County" ditch and through it to the Platte River.

At some point, the Grubers installed a dike along the southern edge of the farmyard to divert water which emanated from the cattle pasture south of the farmyard into the Orchard and Alfalfa Canal. According to plaintiff, after the dike was installed, "very little or no water [came] through that yard from the south . . . ."

There was also testimony that the Orchard and Alfalfa Canal had been dredged a year or two before 1981. In his pretrial deposition plaintiff stated that when the canal was dredged, dirt placed on the west side of the canal blocked the spot where water used to enter the canal from the artificial dike to the south of the farmyard, causing water to enter his farmyard. At trial, he stated, "[T]hat's what caused us some trouble when we got this rain in 1981."

At one time, additional water entered the property through openings located along the 30 Mile Canal. Both plaintiff and the father testified that, eventually, the openings along the 30 Mile Canal were sealed. According to plaintiff, after the openings were sealed, almost all of the water flowing through the property came from the aforedescribed first drainage area.

From 1972 to 1974, the county paved the county road to the north of plaintiff's property. According to the county engineer who designed the drainage structures under the road when it was paved, the elevation of the road was increased "about a foot and a half down by the farmstead and then as you worked back, it varied from two foot to five tenths, or something like that." Three culverts were installed or replaced under the road: a 36-inch culvert was installed where plaintiff's manmade ditch reached the road, a 36-inch culvert replaced an existing one of

the same size where the county road bridge had been located, and a 24-inch culvert was installed in the northeastern corner of plaintiff's property.

After the road was paved, very little water passed over the top of the road. Plaintiff testified that after the road was paved, the culverts could not carry the water, and when the south road ditch was full, the water backed up into the yard. What water exited the property through the culverts under the road was carried east through an open ditch on the north side of the road into a reservoir overflow area west of the Orchard and Alfalfa Canal, where the water remained until it could drain through a pipe under the canal and east into the Tri One-County ditch.

In 1959 or 1960, the Grubers erected a steel grain storage building directly east of the house situated in the farmyard described earlier. Both plaintiff and the father testified that although water had always moved through the farmyard, never before 1972, when pavement of the county road began, had floodwaters collected in the farmyard itself or where the steel building was built. Moreover, plaintiff testified that several times between 1972 and 1981, water collected in the building and, in July 1981 and June 1984, stood to a height of $6^{1}/_{2}$ to 7 inches.

An engineer called as an expert witness by plaintiff surveyed the county road after it had been paved. He calculated that after a $3^{1}/_{2}$- to 4-inch per hour rain, 230 cubic feet per second of water would drain across the property to the south side of the county road, 160 cubic feet per second draining from the hills and canyons under the highway bridge and 70 cubic feet per second draining from the fields. He determined that the three culverts installed by the county under the paved road had a drainage capacity of only 146 cubic feet per second: the culverts at the end of the manmade ditch and where the old county road bridge used to be each had a capacity of 60 cubic feet per second, and the culvert in the northeastern corner of the property had a capacity of 26 cubic feet per second. He opined that the culverts lacked the capacity to carry the anticipated waterflow, having capacity only to carry about 63 percent of the total water drainage.

Plaintiff's expert further opined that the velocity of water

through plaintiff's manmade waterway was greater than it had been through the natural depression. While this witness opined in his pretrial deposition that the county was not negligent in designing the drainage system under the road, he also said that the county should have redesigned the drainage system and that he would not have approved the drainage structures the county used. At trial, plaintiff's expert testified,

> I would have put a larger culvert at the west end, the end of that man-made drain way through the field . . . .
>
> . . . .
> . . . Simply because it carries the water from the culvert under the highway [21] to the county road and since that box culvert under the highway has such a large cross-sectional area and can carry so much water, I would have taken a hard look at the size of the culvert at the end of that drain way.

This witness testified further that sufficient capacity existed in the ditch on the north side of the road to carry the water which passed under the road, through the culverts, and east toward the reservoir area.

The county engineer claimed that the calculations made by plaintiff's expert were theoretical, but conceded that when he designed the water drainage system, he did not take into account the rainfall patterns in the area. He expressed the view that it was possible some of the flooding on plaintiff's property was caused by the paving of the road, but when asked if plaintiff could have "suffered the same damage" even if the road had not been improved, assuming a "storm [of] sufficient intensity," he replied affirmatively. He acknowledged, however, that he did not design the drainage system in accordance with "the ordinary standards in the engineering profession available in 1972," but did what "was to the best of [his] ability, according to the conditions that we had to deal with that were impossible."

The record reveals that a break in the bank of the 30 Mile Canal occurred in 1981 to the west of plaintiff's property, but that none of the water from the breakout flowed onto plaintiff's property. Further, while there is evidence that the 30 Mile Canal overran its banks in 1981 and 1984, there is no

evidence that this occurred on plaintiff's property.

We begin our analysis by recalling that a party seeking an injunction must establish by competent evidence every controverted fact necessary to entitle him or her to relief. *Federal Land Bank of Omaha v. Swanson,* 231 Neb. 868, 438 N.W.2d 765 (1989); *Belsky v. County of Dodge,* 220 Neb. 76, 369 N.W.2d 46 (1985). We also bear in mind that in an appeal of an action in equity such as one seeking an injunction, this court tries the factual issues raised by appellant's assignments of error de novo on the record and reaches its conclusions independent of the findings of the trial court; however, where credible evidence is in conflict on material issues of fact, we consider and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Federal Land Bank of Omaha v. Swanson, supra; Kula v. Prososki,* 228 Neb. 692, 424 N.W.2d 117 (1988); *Johnson v. NM Farms Bartlett,* 226 Neb. 680, 414 N.W.2d 256 (1987); Neb. Rev. Stat. § 25-1925 (Reissue 1985). In that connection, where the district judge as the finder of fact has viewed the premises, which the district court judge did here, but the record does not reveal what the judge saw nor what findings the judge made as a result of the view, we give no weight to the fact that the view was made. *Johnson v. NM Farms Bartlett, supra.*

We now turn our attention to the first drainage area, that is, the water which flows through plaintiff's manmade ditch. The initial inquiry is whether that ditch is a statutory watercourse. Such a watercourse is defined as " '[a]ny depression or draw two feet below the surrounding lands and having a continuous outlet to a stream of water, or river or brook . . . .' " *Belsky v. County of Dodge, supra* at 81, 369 N.W.2d at 51; Neb. Rev. Stat. § 31-202 (Reissue 1988). A watercourse need not flow continuously, but it must have a well-defined and substantial existence. *Grint v. Hart,* 216 Neb. 406, 343 N.W.2d 921 (1984); *Northport Irr. Dist. v. Jess,* 215 Neb. 152, 337 N.W.2d 733 (1983).

The evidence does not convince us that the manmade ditch is a statutory watercourse. Although plaintiff testified that the ditch was a "depression or draw" 3 feet below the surrounding

lands, the ditch does not appear to have a direct "continuous outlet to a stream of water, or river or brook." Before the county road was paved, water which crossed over the road to the north from the ditch would first flow northeast across farmland and either enter, at a point north of plaintiff's property, the Orchard and Alfalfa Canal, which drained east into the Platte River, or, if the canal overflowed, would proceed east into the Tri One-County ditch and through it to the Platte River.

The evidence does, however, convince us that the manmade ditch is a natural drainageway which existed on the property at the time the county road was paved. A natural drainageway develops when diffused surface waters concentrate and gather in volume so as to lose their character as diffused surface waters and flow into any well-defined course, whether it be a natural depression, ditch, swale, or draw in its primitive condition, and whether or not it is 2 feet below the surrounding land. *Holman v. Papio Nat. Resources Dist.*, 228 Neb. 94, 421 N.W.2d 430 (1988); *Belsky v. County of Dodge, supra*; *Shotkoski v. Prososki*, 219 Neb. 213, 362 N.W.2d 59 (1985).

It is not important to characterizing a manmade drainageway as a "natural drainageway" that it has artificial elements. In *Holman v. Papio Nat. Resources Dist., supra* at 101, 421 N.W.2d at 435, we stated that "the mere presence of an artificial element in a drainageway does not destroy its characterization as a natural drainageway. It is only where an essential part of the drainageway is artificial or manmade that such characterization may be precluded." See, also, *Belsky v. County of Dodge, supra*. Even after construction of the ditch, water was nevertheless carried across the property from the same entrance to the same exit.

A natural drainageway must be kept open to carry water into streams, and as against the rights of an upper proprietor, a lower proprietor cannot obstruct surface water which is moving in a natural drainage channel or depression. *Belsky v. County of Dodge, supra*. One building a structure across a natural drainageway has a continuing duty to provide natural passage for water reasonably anticipated to move in the drainageway occupied by the obstruction. *Id.* The duty to refrain from

structural obstruction of a natural drainageway is imposed on private proprietors and public officials as well. *Id.*

To prevail under the theory that an altered road obstructed a natural drainageway, the complaining landowner must prove by a preponderance of the evidence that a drainageway traversed the road before the road was altered, that the drainageway was formed and existed in a state of nature, and that it carried water from a higher to a lower estate. *Belsky v. County of Dodge*, 220 Neb. 76, 369 N.W.2d 46 (1985). See, also, *Slusarski v. County of Platte*, 226 Neb. 889, 416 N.W.2d 213 (1987). Plaintiff has succeeded in proving these three elements with respect to the waters carried through the manmade ditch. It is clear that a natural drainageway carried water across plaintiff's property and either over the county road or under the county road bridge. Further, it is clear that the water was carried from a higher to a lower estate.

Where an obstruction in a drainageway or natural watercourse constitutes a continuing and permanent injury to adjoining landowners, injunctive relief may be granted upon a proper showing. See *Wilson Concrete Co. v. County of Sarpy*, 189 Neb. 312, 202 N.W.2d 597 (1972).

Having dealt with the first area of drainage from plaintiff's property, we turn our attention to the second area of drainage, which involves precipitation waters which fall upon the property. These waters may be characterized as diffused surface waters. "Diffused surface water" is water which appears upon the surface of the ground in a diffused state, with no permanent source of supply or regular course, which ordinarily results from rainfall or melting snow. *Shotkoski v. Prososki, supra*. Surface waters may be dammed, diverted, or otherwise repelled by an adjoining landowner without liability if it is necessary and done without negligence. *Shotkoski v. Prososki, supra*; *Krafka v. Brase*, 218 Neb. 335, 353 N.W.2d 276 (1984); *LaPuzza v. Sedlacek*, 218 Neb. 285, 353 N.W.2d 17 (1984); *Barry v. Wittmersehouse*, 212 Neb. 909, 327 N.W.2d 33 (1982).

The evidence satisfies us that these surface waters pool on plaintiff's farmyard because the county negligently failed to take the relevant rainfall patterns into account when designing the drainage systems involved with paving the county road.

We have said:

" 'Failure to make proper provision for the flow of water under a bridge or culvert has been held to impose liability, although such bridge or culvert may be constructed according to approved principles of engineering; the fact that it does materially obstruct the flow being held to be in itself evidence that it was not properly constructed, regardless of the principles upon which it was built.' "

*Belsky v. County of Dodge, supra* at 85, 369 N.W.2d at 53.

The county, however, claims other factors combined with the road changes to cause such pooling of water on the property. Taking these claims in turn, the county first asserts that overflows of the Orchard and Alfalfa Canal and 30 Mile Canal contributed to the flooding; however, the county presented no evidence that the overflow of either canal contributed to the flooding problem on the land. The county next contends that the dredging of the Orchard and Alfalfa Canal so as to block water from the dike to the south of plaintiff's farmyard from entering the canal contributed to the pooling of water in that area. However, the dredging did not occur until 1979 or 1980, and plaintiff testified that water collected in his steel building several times between 1972 and 1981. Finally, the county urges that the increase in velocity of water through the manmade ditch beyond the velocity that existed in the natural depression contributed to the pooling of water in the farmyard. Once again, there is no evidence to suggest that such is the case. Indeed, the manmade ditch was constructed in the late 1940s, and pooling did not occur until after the road was paved. In summary, the evidence does not convince us that factors other than the paving of the road caused the flooding of which plaintiff complains.

Accordingly, we reverse the judgment of the district court and direct that it enter an injunction preventing the county from obstructing the natural drainage of water from plaintiff's property and from negligently repelling such surface waters as fall, arise, or flow upon said property by making provision to drain 230 cubic feet of water per second from plaintiff's land.

REVERSED AND REMANDED WITH DIRECTION.