NU-DWARF FARMS, INC., A NEBRASKA CORPORATION, APPELLANT,
V. STRATBUCKER FARMS, LTD., A NEBRASKA LIMITED PARTNERSHIP,
ET AL., APPELLEES.

470 N.W.2d 772

Filed June 14, 1991.    No. 89-369.

Thomas C. Huston and Mark A. Christensen, of Cline, Williams, Wright, Johnson & Oldfather, for appellant.

Michael S. Mostek, of McGill, Parsonage & Lanphier, P.C., for appellees.

BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

Appellant, Nu-Dwarf Farms, Inc., commenced this action seeking a mandatory permanent injunction requiring appellees, Stratbucker Farms, Ltd., Herman Stratbucker, and Stratbucker Farms of Nebraska, Inc. (hereinafter collectively referred to as Stratbuckers), to unblock an artificial drainage ditch which transversed a portion of Stratbuckers' land. Nu-Dwarf claims it is entitled to relief under the theory that by blocking the drainage ditch, Stratbuckers unlawfully obstructed a watercourse, and under the additional theory that Stratbuckers' conduct unreasonably interfered with Nu-Dwarf's use and enjoyment of its property. The district court granted the Stratbuckers' motion for summary judgment and overruled Nu-Dwarf's motion for such judgment. Nu-Dwarf asserts, in summary, that the district court (1) erred in concluding that the law affords the drainage ditch no protection from obstruction and that there could thus be no question of fact as to Nu-Dwarf's enjoyable use of its own property and (2) erred in overruling Nu-Dwarf's motion. We reverse and remand with direction.

Before proceeding to a recitation of the relevant facts and analysis of the applicable substantive law, we recall that our review is controlled by the rule that summary judgment is proper when the pleadings, depositions, admissions, stipulations, and affidavits in the record show that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from any material fact and that the movant is, as a matter of law, entitled to judgment. *Flynn v. Bausch, ante* p. 61, 469 N.W.2d 125 (1991); *Millard v. Hyplains Dressed Beef*, 237 Neb. 907, 468 N.W.2d 124 (1991). Moreover, when reviewing a motion for summary judgment, the Supreme Court views the evidence in a light most favorable to the party opposing the motion and gives that party the benefit of all reasonable inferences deducible from that evidence. *Millard v. Hyplains Dressed Beef, supra.* Additionally, although the denial of a motion for summary judgment is not a final order and thus is not appealable, when adverse parties have each moved for summary judgment and the trial court has sustained one of the motions, the reviewing court obtains jurisdiction over both of the motions and may determine the controversy which is the subject of those motions, making an order specifying the facts which appear without substantial controversy and directing such further proceedings as it deems just. *Licht v. Association Servs., Inc.*, 236 Neb. 616, 463 N.W.2d 566 (1990).

With those rules in mind, we turn our attention to the facts. The parties own adjacent farmland in Washington County, Nebraska, just south of the DeSoto National Wildlife Refuge. Nu-Dwarf owns the west half of the northwest quarter and Tax Lots 15 and 18 of Section 35, Township 18 North, Range 12 East of the 6th P.M. Tax Lot 18 comprises all but the extreme southwest corner of the northwest quarter of the southwest quarter of Section 35, and Tax Lot 15 is essentially the northern half of the southeast quarter of the northwest quarter of Section 35. Nu-Dwarf's petition alleges that Stratbucker Farms, Ltd., is the record owner of Tax Lot 23, property abutting that of Nu-Dwarf on the south and east, and that the true owner is Stratbucker Farms of Nebraska, Inc., by virtue of unrecorded deeds.

U.S. Highway 75 crosses the southwest quarter of Section 35, running from the northwest to the southeast. There is a railroad right-of-way along the northeastern edge of the highway. That portion of the right-of-way which is within Section 35 is referred to as Tax Lot 25. Nu-Dwarf's petition asserts that Herman Stratbucker claims an interest in Tax Lot 25 but that, by virtue of another unrecorded deed, the true owner is Stratbucker Farms of Nebraska, Inc. George Stratbucker, one of the shareholders of Stratbucker Farms of Nebraska, Inc., and a limited partner in Stratbucker Farms, Ltd., stated that Stratbucker Truck Farms, Ltd., is the owner of Tax Lot 25. It appears that Stratbucker Truck Farms, Ltd., and Stratbucker Farms, Ltd., may be the same entity, which is also referred to in the depositions as "Stratbucker Truck" and perhaps "Stratbucker Farms" as well. In their answer, Stratbuckers allege that Herman Stratbucker is the record owner of Tax Lot 25 and that an unrecorded deed exists naming Stratbucker Farms of Nebraska, Inc., as grantee of Tax Lot 25.

The Nu-Dwarf property originally drained in a south-southwesterly direction into a swamp; it is not clear whether this drainage flowed along a well-defined natural course. It appears that the Chicago and North Western Transportation Company laid a rail line adjacent to the Nu-Dwarf property in the 1870's, obstructing the natural drainage. A ditch was dug along the railroad right-of-way, and this ditch carried the drainage from Nu-Dwarf in a southeasterly direction, the drainage eventually making its way into the nearby Missouri River. This railway ditch is parallel to the railroad and highway and extends to the northwest beyond Section 34. The ditch was extant in 1933 and may date to the building of the railroad.

In the early 1940's, the ditch was deepened by the then owner of the Nu-Dwarf property, apparently with the railroad paying the costs. At that same time, two ditches were constructed on the Nu-Dwarf property, emptying into the railway ditch. Nu-Dwarf's president stated that he performs maintenance on the railway ditch once each year.

The railroad was abandoned in the early 1980's, and the portion of the right-of-way referred to as Tax Lot 25 made its

way into the hands of Stratbuckers. In June 1987, Stratbuckers filled a large section of the ditch within this lot, and water no longer passes through. The unfilled portion of the ditch is several feet deep, and the filled portion is alleged to be as much as 6 feet in depth. George Stratbucker stated that he had the ditch filled "[b]ecause we had purchased the property and it was a mess with trees and a fence, and we wanted to incorporate the property that we purchased with the rest of the land." At the time of suit, the filled area was not planted but was in "government idle acres." Stratbuckers did not inform Nu-Dwarf about the filling of the ditch, and George Stratbucker stated that he had not really given any thought to Nu-Dwarf's drainage.

On the cadastral maps contained in the record, there is a narrow finger of land separating Tax Lot 25 and the Nu-Dwarf property. There appears to be a separate dispute between Nu-Dwarf and Stratbuckers over ownership of this land. Nu-Dwarf's president also claims ownership of a portion of Tax Lot 25; however, since Nu-Dwarf's petition asserts that the true owner of Tax Lot 25 is Stratbucker Farms of Nebraska, Inc., we need not concern ourselves with this claim.

The district court, in sustaining Stratbuckers' motion for summary judgment, held: "Nebraska law does not provide the right of protected drainage through an artificial drainway. The drainage of [Nu-Dwarf] not being protected, [Stratbuckers are] not required to restore the ditch to its former condition; nor [are Stratbuckers] liable for damages, if any . . . ."

In connection with its first theory of recovery, Nu-Dwarf alleges that the railway ditch is a statutory watercourse within the meaning of Neb. Rev. Stat. § 31-202 (Reissue 1988); claims that the ditch received and drained Nu-Dwarf's land from at least March 5, 1973, the date it acquired the property; and asserts that by filling in a portion of the ditch, Stratbuckers obstructed the flow of surface waters, to Nu-Dwarf's detriment.

The Nebraska rule regarding interference with surface waters was announced in *Nichol v. Yocum*, 173 Neb. 298, 113 N.W.2d 195 (1962). Under *Nichol*, a lower proprietor may defend his or her land against diffused surface waters, so long as that defense

does not negligently or unnecessarily injure another, while an upper proprietor has a right to drain surface waters through a natural drainageway, and the flow of that drainageway cannot be arrested or interfered with to the injury of neighboring proprietors.

Diffused surface waters are "waters which appear upon the surface of the ground in a diffused state, with no permanent source of supply or regular course, which ordinarily result from rainfall or melting snow." *Nichol v. Yocum, supra* at 303, 113 N.W.2d at 198; *Romshek v. Osantowski*, 237 Neb. 426, 466 N.W.2d 482 (1991). A natural drainageway is formed when diffused surface waters are channeled into a well-defined natural course, whether the course be ditch, swale, or draw in its primitive condition. *Id.*; *Romshek v. Osantowski, supra*. Unlike a statutory watercourse, a natural drainageway need not be at least 2 feet below the surrounding land. *Romshek v. Osantowski, supra*. Cf. § 31-202 ("[a]ny depression or draw two feet below the surrounding lands and having a continuous outlet to a stream of water, or river or brook shall be deemed a watercourse").

The rule that water flowing in a natural drainageway may not be dammed, repelled, or diverted without liability for damages caused thereby arises from the theory that the lower estate, through which the natural drainageway runs, is under a natural servitude to receive the water flowing along the drainageway from the higher estate. *Nichol v. Yocum, supra*; 3 H. Farnham, The Law of Waters and Water Rights § 889d (1904). The lower estate is not, however, under a natural servitude to receive diffused surface waters which have not found their way into a natural drainageway, since the physical attributes of the land do not make the servitude apparent to a prospective purchaser. *Nichol v. Yocum, supra*, quoting 3 H. Farnham, *supra*.

In essence, diffused surface waters are treated as a common enemy (subject to the rule requiring necessity and absence of negligence) until they are channeled into a natural drainageway, at which point the notion of a natural servitude comes into play, prohibiting obstruction of the drainageway to the detriment of others.

Under *Nichol*, the key to the upper proprietor's right is the existence of the servitude, impressed by nature on the lower estate in the form of a natural drainageway. In the case before us, the railway ditch is not a natural ditch, swale, or draw, but an artificial creation. It is not, therefore, a *natural* drainageway. The natural drainage from the Nu-Dwarf property was toward the southwest, while Tax Lot 25 is south of Nu-Dwarf. The record indicates that in a state of nature Tax Lot 25 did not receive surface waters from Nu-Dwarf's land. Therefore, no natural servitude was impressed upon Tax Lot 25 in favor of Nu-Dwarf's land.

There is evidence, however, that the natural drainage of the Nu-Dwarf property crossed the railroad right-of-way at a point somewhat to the northwest of Tax Lot 25 and that this natural drainage was obstructed by the railway bed. If this drainage occurred via natural drainageways, the right-of-way was subject to a natural servitude, and the railroad had a continuing duty to provide for the passage of those surface waters. See, *Lee v. Chicago, B. & Q. R. R. Co.*, 151 Neb. 797, 39 N.W.2d 574 (1949); *Arnold v. Huenefeld*, 176 Neb. 683, 127 N.W.2d 196 (1964).

Apparently, the railroad chose to fulfill this duty by channeling the water into its ditch rather than providing for its passage beneath the railway bed. Because Nu-Dwarf's predecessors suffered no injury, they could not complain of this choice, although if there were a lower proprietor injured by the diversion, that proprietor could have sought redress. See *Nickerson Township v. Adams*, 185 Neb. 31, 173 N.W.2d 387 (1970). In any event, the railroad substituted the natural drainageway crossing its right-of-way with an artificial one paralleling its tracks. By making this substitution, the railroad impressed a drainage servitude upon its right-of-way, replacing the existing natural servitude. Its ditch is simply a substitute for the natural drainageways off the Nu-Dwarf property.

Stratbuckers make much of the fact that the substituted drainageway does not follow the general course of drainage as it existed in a state of nature and that in such state Nu-Dwarf's property did not drain across Tax Lot 25. Stratbuckers overlook that this change from the natural scheme is the result

of positive acts by their predecessor in interest, which chose to burden its own property. Had there been no railway bed blocking Nu-Dwarf's natural drainageways, or had Tax Lot 25 not been part of the railroad's right-of-way, then Stratbuckers' position might have merit; however, the record, when read in the light most favorable to Nu-Dwarf, establishes that such was not the case.

We have stated that a landowner

> is the owner of surface waters which fall, arise, or flow upon it, and he may retain them for his own use without liability. He may also change their course on his own land by ditch or embankment, but he may not divert them upon the lands of others except in depressions, draws, swales, or other drainways through which such waters were wont to flow in a state of nature.

*Jameson v. Nelson*, 211 Neb. 259, 263-64, 318 N.W.2d 259, 262-63 (1982), citing *Nichol v. Yocum*, 173 Neb. 298, 113 N.W.2d 195 (1962). It is also essential that one seeking to prohibit such a diversion show some damage or injury resulting from it. *Nickerson Township v. Adams, supra*. The railroad changed the course of the surface waters flowing upon its own land by means of the ditch. Absent some injury to another, it was permitted to do this.

Nu-Dwarf could not unilaterally divert its water onto Stratbuckers' land except via a natural drainageway. Nu-Dwarf, however, is not the party which diverted the drainage; rather, it was Stratbuckers' predecessor in interest who diverted the drainage across its own land. The mere fact that Tax Lot 25 was later severed from the portion of the right-of-way originally burdened with the natural servitude does not free it of the alternative servitude impressed upon it by Stratbuckers' grantor. The record indicates that the ditch's existence (and consequently the existence of the servitude) would be apparent to any purchaser of the property who cared to inspect it. One who purchases land burdened by an open and visible easement is ordinarily charged with notice that he or she is purchasing a servient estate. *Kimco Addition v. Lower Platte South N.R.D.*, 232 Neb. 289, 440 N.W.2d 456 (1989); *Johnson v. Mays*, 216 Neb. 890, 346 N.W.2d 401 (1984); *Magnuson v.*

*Coburn*, 154 Neb. 24, 46 N.W.2d 775 (1951). Generally, a person takes land subject to an easement where that person purchases the land with knowledge or with actual, constructive, or implied notice that the land is burdened with an easement. *Johnson v. Mays, supra.*

The present situation is to be distinguished from that in *Jameson v. Nelson, supra*, cited by Stratbuckers. In *Jameson*, we held that an artificial channel draining surface waters from plaintiffs' property into a natural drainageway on defendant's property was not to be treated as a natural drainageway, despite the fact that the artificial channel had been in use for over 30 years. Unlike in the situation now before us, the artificial channel in *Jameson* was not created by the lower proprietor as a substitute or replacement for a natural drainageway which that proprietor had blocked.

Stratbuckers also cite *Belsky v. County of Dodge*, 220 Neb. 76, 369 N.W.2d 46 (1985), in which we affirmed the denial of an injunction based on the claim that the county, in the course of building a bridge, obstructed a natural drainageway across a road. Although *Belsky* refers to the road as "an integral but artificial component of the drainway, [which] prevents characterizing any traversing drainway as one existing in a state of nature," *id.* at 83, 369 N.W.2d at 52, it is not the mere fact that there was an artificial component to the drainageway which prevented recovery, but the fact that no drainageway ever existed on the land in a state of nature. The facts disclosed that the land in question was level, and the surface waters flowed across a roadway simply because the absence of vegetation made that the path of least resistance. There was no evidence of a natural depression, draw, swale, or other drainageway existing as the result of natural forces. "Drainage of Belsky's farm resulted from the road's surface and was not attributable to characteristics of land in a natural state." *Id.* In other words, the county's right-of-way was not impressed with a natural servitude. Therefore, *Belsky*, like *Jameson*, is inapposite. This is clear from a review of subsequent cases in which we have held that an entirely manmade channel which replaces a natural drainageway is still considered a natural drainageway. See *Gruber v. County of Dawson*, 232 Neb. 1, 439 N.W.2d 446

(1989).

Stratbuckers also claim that Neb. Rev. Stat. § 31-201 (Reissue 1988), which speaks in terms of "natural watercourses," defines the limits of drainage rights in Nebraska. This position, however, is untenable. See, *Aldritt v. Fleischauer*, 74 Neb. 66, 103 N.W. 1084 (1905) (right to drain exists independent of the drainage statute); R. Harnsberger & N. Thorson, Nebraska Water Law & Administration § 4.11 (1984); 5 R. Clark, Waters and Water Rights §§ 455 et seq. (1972).

We thus hold that when a landowner substitutes a permanent artificial drainageway crossing his or her own land for a natural one obstructed by that landowner, the landowner impresses the artificial drainageway with a servitude in favor of the land drained thereby, and the upper proprietor (that is, the owner of the land drained) may enforce this servitude against the substituting landowner and its successors in interest. The mere fact that the land through which the easement runs is later subdivided does not destroy the easement.

It is therefore clear, without our reaching the issues presented by Nu-Dwarf's second theory of recovery, that the district court erred in sustaining Stratbuckers' motion for summary judgment. However, that does not mean the district court should have granted Nu-Dwarf's motion. In order for a court to find an easement by substitution, Nu-Dwarf must prove that the railroad blocked a natural drainageway which drained the Nu-Dwarf property and that at least part of the purpose of the railway ditch was to replace that natural drainageway. Since the depositions only speak in terms of natural or original drainage and not drainageways, a question of fact exists as to whether this drainage occurred via natural drainageways.

Finally, there is a question of fact as to precisely which Stratbucker owns the property in question and, thus, who should be enjoined, if anyone.

Accordingly, we reverse the judgment of the district court and remand the cause for further proceedings consistent with this opinion.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.

HASTINGS, C.J., not participating.