Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
02/04/2025 09:10 AM CST

JERRY SPADY, APPELLEE AND CROSS-APPELLANT,
v. RON PUGHES ET AL., APPELLEES, AND
BEN ENGEL AND ANDREA ENGEL,
APPELLANTS AND CROSS-APPELLEES.

___ N.W.3d ___

Filed January 28, 2025.    No. A-23-1004.

1. **Equity: Quiet Title.** A quiet title action sounds in equity.
2. **Equity: Appeal and Error.** On appeal from an equity action, an appel-
   late court decides factual questions de novo on the record and, as to
   questions of both fact and law, is obligated to reach a conclusion inde-
   pendent of the trial court's determination.
3. **Equity: Evidence: Appeal and Error.** In an appeal of an equity action,
   where credible evidence is in conflict on a material question of fact, an
   appellate court considers and may give weight to the fact that the trial
   court heard and observed the witnesses and their manner of testifying,
   and accepted one version of the facts rather than another.
4. **Damages: Appeal and Error.** A fact finder's decision as to the amount
   of damages will not be disturbed on appeal if it is supported by the
   evidence and bears a reasonable relationship to the elements of the dam-
   ages proved.
5. **Adverse Possession: Proof: Time.** A party claiming title through
   adverse possession must prove by a preponderance of the evidence that
   the adverse possessor has been in (1) actual, (2) continuous, (3) exclu-
   sive, (4) notorious, and (5) adverse possession under a claim of owner-
   ship for a statutory period of 10 years.
6. **Adverse Possession: Notice.** To be effective against the true owner, acts
   of dominion over land allegedly adversely possessed must be so open,
   notorious, and hostile as to put an ordinarily prudent person on notice of
   the fact that the lands are in the adverse possession of another.
7. **Adverse Possession.** If an occupier's physical actions on the land
   constitute visible and conspicuous evidence of possession and use of
   the land, such will generally be sufficient to establish that possession
   was notorious.

8. ____. Where both parties have used the property in dispute, there can be no exclusive possession by one party.

9. ____. The law does not require that adverse possession be evidenced by complete enclosure and 24-hour use of the property. It is sufficient if the land is used continuously for the purposes to which it may be adapted.

10. ____. Actual occupancy or possession is always involved in any claim to land by adverse possession. No particular act is required to establish actual possession. Rather, the acts required depend upon the character of the land and the use that can reasonably be made of it.

11. **Adverse Possession: Notice.** The acts of dominion over land allegedly adversely possessed must, to be effective against the true owner, be so open, notorious, and hostile as to put an ordinarily prudent person on notice of the fact that the lands are in adverse possession of another.

12. **Adverse Possession.** If an occupier's physical actions on the land constitute visible and conspicuous evidence of possession and use of the land, that will generally be sufficient to establish that possession was notorious.

13. ____. Although the enclosure of the land renders the possession of land open and notorious, it is not the only way by which possession may be rendered open and notorious. Nonenclosing improvements to land, such as erecting buildings or planting groves or trees, which show an intention to appropriate the land to some useful purpose, are sufficient.

14. **Adverse Possession: Title.** Title may be acquired by adverse possession even though the claim of ownership was invalid and the occupant believed the occupant was asserting legal rights only. The claim of adverse possession is founded upon the intent of the occupant, such intent being determined by the occupant's acts. Intent, even though mistaken, is sufficient where the claimant occupies to the wrong line believing it to be true and even though the claimant does not intend to claim more than that described by the deed. The possession of the occupant is not less adverse because the occupant took and had possession innocently and through mistake; it is the visible and exclusive possession with intention to possess the land occupied under the belief that it belongs to the occupant that constitutes its adverse character.

15. **Equity: Estoppel.** Judicial estoppel is an equitable doctrine that a court invokes at its discretion to protect the integrity of the judicial process.

16. **Estoppel.** The doctrine of judicial estoppel prevents a party from taking a position inconsistent with one successfully and unequivocally asserted by the same party in a prior proceeding.

17. ____. Judicial estoppel is to be applied with caution so as to avoid impinging on the truth-seeking function of the court, because the doctrine precludes a contradictory position without examining the truth of either statement.

18. **Judgments: Issue Preclusion.** Issue preclusion applies where (1) an identical issue was decided in a prior action, (2) the prior action resulted in a final judgment on the merits, (3) the party against whom the doctrine is to be applied was a party or was in privity with a party to the prior action, and (4) there was an opportunity to fully and fairly litigate the issue in the prior action.

19. **Property: Damages.** Where the land damaged can be returned to its prior condition by treatment, grading, or otherwise, the damage is temporary and the landowner is entitled to such expenses as part of his or her damages.

20. **Actions: Property: Damages.** In an action for compensatory damages for cutting, destroying, and damaging trees and other growth, and for related damage to the land, when the owner of land intends to use the property for residential or recreational purposes according to his or her personal tastes and wishes, the owner is not limited to the difference in value of the property before and after the damage or to the stumpage or other commercial value of the timber. Instead, the owner may recover as damages the cost of reasonable restoration of the property to its preexisting condition or to a condition as close as reasonably feasible. However, the award for such damage may not exceed the market value of the property immediately preceding the damage.

Appeal from the District Court for Adams County: MORGAN R. FARQUHAR, Judge. Affirmed.

Jared J. Krejci, of Smith, Johnson, Allen, Connick & Hansen, for appellants.

Robert M. Sullivan, of Sullivan Law, P.C., L.L.O., for appellee Jerry Spady.

William K. Rounsborg and Todd R. McWha, of Waite & McWha Law Firm, for appellee Ron Pughes.

RIEDMANN, Chief Judge, and MOORE and WELCH, Judges.

RIEDMANN, Chief Judge.

## I. INTRODUCTION

Ben Engel and Andrea Engel appeal from the order of the district court for Adams County that quieted title to 1.36 acres of land in Jerry Spady (Spady) under a theory of adverse possession and awarded him damages. Spady cross-appeals from

the same order. Following our review, we affirm the judgment of the district court.

## II. BACKGROUND

### 1. PROCEDURAL HISTORY

In 1977, Spady purchased a parcel of land on Prairie Lake Road near Hastings, Nebraska, which parcel we will refer to throughout the opinion as the "Hastings property." At the time, it was a vacant lot and adjacent land was owned by the parties' predecessors. For simplicity's sake, we will refer to that land as belonging to the current owners. In 1979, Spady began building a home on the lot, which home was finished in 1983 or 1984. Spady later built a detached garage next to the house, which garage was likely completed by 1990. Approximately 10 to 20 feet of the garage encroached on the Engels' property. In 1999, Spady constructed a pond to the northwest of his home. The pond encroached on the Engels' land, as well as adjacent land now owned by Ron Pughes and Jennifer Pughes. Landscaping, including a Japanese garden and a koi pond, that Spady added near the pond also encroached on the Engels' property. Additionally, Spady's then wife, Sandy Spady, "reforaged all of the forest in the back" that ran along the 32 Mile Creek to the north of the property, and she planted and maintained over 250 chokecherries in that area, which also was on neighboring land.

When Ben began adding an addition to the home he purchased from his father, he suspected the pond and garage encroached on his property. In the spring of 2015, Ben had the property surveyed, and it confirmed his suspicion. Ben was concerned because the pond was only half full and his dog had fallen in and could not get out. He met with Spady, and Spady agreed to keep the pond full. According to Ben, Spady told him during that conversation that because the improvements were on Ben's land, he was welcome to use them anytime.

In November 2018, while Spady was out of town, Ben, with Ron's permission, used an excavator to fill in the pond, effectively leveling it. In the process, railroad ties that had been used to construct the pond were buried in the dirt. After leveling the pond, the Engels and the Pugheses put up fences and signs to mark the boundary lines of their respective properties.

After Spady discovered the pond had been destroyed, he had the property surveyed to determine the dimensions of the area around the pond and other landscaping, which area was shown to be an area of 1.36 acres. The northern portion of the 1.36 acres was a long panhandle running along the high water mark of the 32 Mile Creek that stretched from the garage to the pond, and then enclosed the pond area. The panhandle and northwest portion of the pond was on the Engels' property, and the remainder was on the Pugheses' property. Spady filed this action to quiet title in the 1.36 acres in his name under a theory of adverse possession. At trial, multiple witnesses testified and numerous exhibits were entered into evidence. The following is a summary of evidence presented at trial relevant to the issues on appeal.

## 2. POND

### (a) Construction of Pond

Records from Darrel Stromer, who constructed the pond, showed that construction began in 1999. The site was excavated, and the pond was constructed using railroad ties on the outside to act as a wall. In order to preserve a large cottonwood tree that was within the excavated area, an island was built around it in the middle of the pond. Spady and Sandy piped in water from their irrigation well to fill the pond. However, from the time the pond was built, it would not hold water and Spady and Sandy continued to pump water into the pond. Sometime after the pond was built, but prior to the couple's divorce proceedings, which took place from 2013 to

2015, Sandy placed a rubber liner in the pond; however, the pond continued to lose water.

Photographs of the pond showed an area with flowers and other landscaping surrounding it. Sandy planted daylilies and other plants around the pond and assisted in installing a sprinkler system. Spady added light poles around the pond. A brick pathway was created near the pond, and a garden area and koi pond were added. According to several witnesses, the 1.36 acres appeared to be part of Spady's backyard.

Rick Johnson, the owner of a sod company, saw the pond sometime prior to 2014. He testified that Spady's backyard flowed into the pond area, which appeared to be part of Spady's property. Roger Ahlers, the owner of a lawn maintenance company, maintained the property around the pond annually from 2005 until September 2018. Ahlers confirmed that during his time working on Spady's property, he was under the impression that the area around the pond was Spady's property, because it was fenced in with railroad ties, had benches and light poles, and looked like the rest of Spady's yard.

#### (b) Condition of Pond After 2014

Sandy believed she and Spady stayed at the Hastings property about 2 months out of the year, exclusively in the summer, from the time the pond was built until their divorce. In an email sent near the time of the divorce, Spady represented that he had not lived in Hastings for more than 2 months a year since he had retired around the year 2000. Sandy was granted exclusive use of the Hastings property at the beginning of the 2013 divorce proceedings and stayed there until September 2014. When she left the property, she believed the pond was empty, dilapidated, and falling apart. There was erosion on the banks, numerous floods had taken railroad ties away, and the rubber liner was peeling back.

Spady took possession of the Hastings property after Sandy moved out, and he spent time working to restore the property, including the gardens and the "lake." Spady removed the tree

and its island from the middle of the pond in an attempt to stop the pond from leaking, but it continued to leak and Spady was continually working to try and fix it.

Spady testified that he believed the 1.36 acres was included in his purchase of the Hastings property, but, regardless, he had used it. He denied seeing anyone using the 1.36 acres without his permission after 1999. If he had seen someone on the 1.36 acres without his permission, he would have told them to get off the property. Spady thought taxes for the area were included in his property taxes for the Hastings property, but he did not know for sure. Sandy testified that Spady had told her that he had permission from Ben's father to "clean it all up," but Spady denied this.

As previously described, the 1.36 acres had a long panhandle to the north running alongside the high water mark of the 32 Mile Creek from the garage to the pond, and then dipped to the south to enclose the pond area. The surveyor Spady hired to determine the area he was claiming by adverse possession testified that he included part of an adjacent wooded area slightly inside the 1.36 acres, but he could not quantify how much. The surveyor used the high water mark of the nearby creek for the northern boundary of the panhandle portion, and he used the area of what appeared to have been disturbed and excavated earth to determine the remaining boundaries in the northwest section.

### 3. Engels' Use of 1.36 Acres

The Engel family had originally owned the land now owned by the Engels and the Pugheses, and Ben grew up on that land from 1974 until about 1993 or 1994. He returned and expanded the house on that land in 2014 or 2015. It is unclear exactly when the property the Pugheses now own was sold outside the Engel family, but it appears to have been sometime around the year 2000. Ben testified that during his life, including after the pond was built in 1999, he would use the land his family owned, including the 1.36 acres at issue here.

Ben confirmed, however, that he did not use any of the land-scaped or manicured portions of the 1.36 acres; rather, his use was confined primarily to the wooded area along the perimeter of the 1.36 acres. Ben stated he would occasionally drive an "ATV" through the wooded area; he also took walks and sometimes picked up firewood in the wooded area.

Ben believed that he used the wooded area at least once a year between 2004 and 2014; he moved into his current house around 2015. Ben was asked to mark on an exhibit the area of the 1.36 acres that contained trees. Most of the area he identified along the southern and western border adjacent to the pond was outside of the 1.36 acres; however, he identified trees along the northern border within the 1.36 acres.

Ben testified that from 1983 through 2020, he would drive an ATV between his parents' house to his grandfather's house, which was south of the area, a few times a year. However, when riding his ATV, he would not go on the landscaped portions of Spady's yard. Ben confirmed that when on the narrower portion of the 1.36 acres, even when he crossed the creek, he was not within 20 feet of the property line.

Michael Bauer, Ben's friend, testified that he would use the land with Ben, including the 1.36 acres, and had done so throughout his life. Bauer also limited his use of the land, stating they would have gone to the edge of the treed area but would not have gone onto the landscaped portions. The only time Bauer recalled being on the banks of the pond was around the time Ben was building the addition in 2014 or 2015.

### 4. CONDITION OF POND IN 2018

When the Pugheses purchased their property in 2018, Ron was disappointed in the condition of the pond. He described it as "an empty hole with trash and debris and T-Posts sticking out the bottom of an empty hole."

Ben testified that there was about a 2-year period after the removal of the tree and island when the pond sat in the same condition with no water and the liner showing. He described

debris at the bottom and a ripped liner, and he stated that although some daylilies still grew, a lot of grasses and weeds had taken over. Photographs taken during this time period confirmed his description. Ben was concerned because there were electrical wires running up trees alongside the koi pond and wires hanging from trees around the pond area; he was worried about his children playing in the area.

Spady disputed that the pond had deteriorated over the years prior to demolition. He asserted that the photographs identified by Ben as being taken before demolition were actually taken after the pond had been leveled. The maintenance worker who performed Spady's yardwork stated he considered the area to be a well-manicured yard all the way up through September 2018. He stated the interior of the pond was "dug up," but that the exterior of the pond was in "good shape."

## 5. Damages

The Pugheses' counsel retained an appraiser who determined that the value of the 1.36 acres was $2,040 before the leveling and that the leveling caused no change in value. The same appraiser determined that the value of Spady's entire property, including the 1.36 acres, was $1 million, both before and after the leveling of the pond. Spady presented testimony to establish what it would cost to rebuild the pond to what he believed was its former condition. This included bids to replace an electrical system, sprinkler system, and landscaping. We will provide additional facts related to the damages sought in our analysis below.

## 6. District Court Order

The district court found that Spady had proved all the elements necessary to establish adverse possession. It found that the Engels and the Pugheses had trespassed on the area when Ben leveled the pond, awarded Spady damages to clean out the buried debris, and awarded him the bid amount to repair the damaged sprinkler system. However, it noted that it was

unclear what condition the pond was in when it was leveled. The district court denied Spady damages for the electrical system and for the cost of replacing damaged vegetation and reconstruction of the pond due to lack of proof. Although the district court found in favor of Spady on his claim for loss of enjoyment and nuisance, it declined to award damages, finding them to be "duplicative" of other requested damages. The Engels appealed, and Spady filed a cross-appeal on the issue of damages.

## III. ASSIGNMENTS OF ERROR

The Engels assign, restated, that the district court erred in quieting title in the 1.36 acres in favor of Spady because (1) he failed to prove the elements of adverse possession, (2) his chosen use of the 1.36 acres was a public nuisance, and (3) his adverse possession claim was barred by judicial estoppel and issue preclusion. The Engels also assign that the district court erred in awarding Spady damages in excess of the market value of the 1.36 acres prior to the leveling.

On cross-appeal, Spady assigns, reordered, that the district court erred in (1) finding it needed to know the exact condition of the pond at the time of the leveling, (2) overlooking the testimony of two of Spady's witnesses, (3) failing to find that elements of electrical damages were in evidence, and (4) failing to award damages for his loss of use and enjoyment of the property.

Spady argues, but does not assign, that the damages awarded do not bear a reasonable relationship to the damages proved at trial and that the damages awarded are insufficient to compensate him for the damages caused by the leveling. However, because he does not assign these as error, we will not address them. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting error to be considered by an appellate court. *In re Interest of Quiotis C.*, 32 Neb. App. 932, 9 N.W.3d 224 (2024).

## IV. STANDARD OF REVIEW

[1,2] A quiet title action sounds in equity. *Siedlik v. Nissen*, 303 Neb. 784, 931 N.W.2d 439 (2019). On appeal from an equity action, an appellate court decides factual questions de novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent of the trial court's determination. *Id*.

[3] In an appeal of an equity action, where credible evidence is in conflict on a material question of fact, an appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and their manner of testifying, and accepted one version of the facts rather than another. *Id*.

[4] A fact finder's decision as to the amount of damages will not be disturbed on appeal if it is supported by the evidence and bears a reasonable relationship to the elements of the damages proved. *Funk v. Lincoln-Lancaster Cty. Crime Stoppers*, 294 Neb. 715, 885 N.W.2d 1 (2016).

## V. ANALYSIS

### 1. Engels' Appeal

#### (a) Adverse Possession

[5] The Engels assign that the district court erred in quieting title of the 1.36 acres in Spady, because he failed to prove the elements of adverse possession. A party claiming title through adverse possession must prove by a preponderance of the evidence that the adverse possessor has been in (1) actual, (2) continuous, (3) exclusive, (4) notorious, and (5) adverse possession under a claim of ownership for a statutory period of 10 years. *Brown v. Morello*, 308 Neb. 968, 957 N.W.2d 884 (2021).

[6,7] To be effective against the true owner, acts of dominion over land allegedly adversely possessed must be so open, notorious, and hostile as to put an ordinarily prudent person on notice of the fact that the lands are in the adverse possession of another. *Id*. If an occupier's physical actions on the

land constitute visible and conspicuous evidence of possession and use of the land, such will generally be sufficient to establish that possession was notorious. *Id*.

[8,9] Where both parties have used the property in dispute, there can be no exclusive possession by one party. *Id*. But the law also does not require that adverse possession be evidenced by complete enclosure and 24-hour use of the property. *Id*. It is sufficient if the land is used continuously for the purposes to which it may be adapted. *Id*. Evidence must show the intention of the claimant to appropriate and use the property as his or her own to the exclusion of all others. *Id*.

### *(i) Actual*

[10] Actual occupancy or possession is always involved in any claim to land by adverse possession. *Wanha v. Long*, 255 Neb. 849, 587 N.W.2d 531 (1998). No particular act is required to establish actual possession. *Id*. Rather, the acts required depend upon the character of the land and the use that can reasonably be made of it. *Id*. Spady built a garage, and a portion of the garage was on the land in dispute and remained there from the time it was built until the present action was filed. Although the exact time the garage was built was not known, it appeared from the evidence to have happened prior to 1990.

In 1991 or 1992, Sandy "reforaged all of the forest in the back" with chokecherries and "things for the wildlife." She gathered wild violets and planted them in the woods. As related to the pond, in 1999, Spady hired Stromer to clear the area and excavate the dirt, and then the excavated area was filled with water. Sandy built a brick pathway, a koi pond, and a Japanese garden. She planted daylilies around the pond. Spady added light poles and a sprinkler system to the area. These elements all remained on the land, at least until 2018.

Johnson believed Spady's entire backyard included the pond. Ahlers was under the impression the area around the pond belonged to Spady because it was fenced in with railroad

ties, had benches and light poles, and looked like the rest of Spady's yard. Sandy gardened all the property, including the northwest corner and the 1.36 acres. Sandy held different events on the property to raise money for community organizations and projects; she confirmed this included giving tours through the 1.36 acres. Building a garage, a pond, and landscaping the area, along with hosting guests, is consistent with the character of the land and the use that could be made of it. Spady had actual possession of the property at issue.

### (ii) Continuous

The Engels argue that Spady did not continuously possess the 1.36 acres because he was only present at the Hastings property seasonally. But the law does not require that adverse possession be evidenced by complete enclosure and 24-hour use of the property. *Brown v. Morello*, 308 Neb. 968, 957 N.W.2d 884 (2021). It is sufficient if the land is used continuously for the purposes to which it may be adapted. *Id*. Evidence must show the intention of the claimant to appropriate and use the property as his or her own to the exclusion of all others. *Id*.

Here, the development of the ponds, the erection of the garage, and the establishment of the brick pathway and landscaping support a finding that the land was adapted for Spady's enjoyment of the land. The evidence further supports a finding that the Spadys, through their fundraisers and other events that they hosted which included use of the 1.36 acres, continuously used the land for the purpose for which it was adopted. Although Spady was not always on the property, the changes he made to the land, such as the garage, pond, and landscaping, evince the continuous use for which it had been adapted. Spady returned at regular intervals and used these features. The evidence was sufficient to show continuous possession.

In their reply brief, the Engels rely in part on *Hardt v. Eskam*, 218 Neb. 81, 352 N.W.2d 583 (1984), to support their

position that Spady's seasonal use does not satisfy the continuous use requirement. In *Hardt*, however, the Nebraska Supreme Court noted that "[t]here [was] no evidence that the hunting-related activity was such as would give notice to anyone that title to real estate was being claimed by adverse possession." 218 Neb. at 83, 352 N.W.2d at 585. We find *Hardt* to be distinguishable from the present case. Here, Spady made physical changes to the land. He built a garage, pond, brick pathway, koi pond, and Japanese garden. Sandy planted daylilies, violets, and chokecherries. Unlike the situation in *Hardt*, these signs of ownership were permanent and remained continuously on the land, giving notice to everyone that title to real estate was being claimed by adverse possession. Under the circumstances of this case, Spady showed continuous use.

### (iii) Exclusive

We find the evidence established that Spady's use of the 1.36 acres was exclusive for at least 10 years. Although the Engels do not argue that Spady did not have exclusive possession of the manicured and landscaped portions of the 1.36 acres, they contend that he did not exclusively possess the wooded area along the northern boundary he now claims. They argue this area "is natural woodland that was never developed by the Spadys at all." Brief for appellants at 24.

The survey reflects the northern boundary on a diagram; there is no photograph upon which this diagram is imposed that would precisely show how much of the wooded area is included in the 1.36 area. The surveyor testified that the wooded area was "slightly inside" of the 1.36 acres, but he was unable to quantify the extent. Rather, he testified that he used the high water mark of the 32 Mile Creek as the northern boundary. Spady confirmed that the creek did not abut the boundary of the 1.36 acres. According to Spady, the land between the creek and the boundary is "part of the creek bed . . . there's a lot of wooded — fall — downed trees and stumps and it's — it's lowland and it's a lot lower than the yard."

Evidence regarding Spady's use of this area includes Sandy's testimony that she planted 250 chokecherry trees in "the forest" and that she "reforaged all of the forest in the back." She gathered wild violets and planted them in the woods. Sandy additionally testified that she worked with Ben's father to clear log jams out of the creek. Ron testified that there were wires "on top of the creek" and "pipes and pumps" "pumping out of the creek." We find this evidence refutes the Engels' argument that Spady did not develop or use the wooded area.

We recognize there was conflicting evidence presented regarding whether Ben had been in the wooded area of the 1.36 acres after the pond was built. Spady testified that he had not seen anyone that had not been given permission on the property in question. Ben and Bauer both testified that during the time in question, they used the 1.36 acres, but Bauer clarified that they never went on the mowed or landscaped areas. Ben confirmed that he stayed away from the landscaped areas.

In their brief on appeal, the Engels rely on a 2001 survey and photographic evidence dating from 2015 to show that Spady did not have exclusive use of the land. They do not explain how simply having a survey of the entire addition done in 2001 proves nonexclusive possession. Nor do photographs depicting use by the Engels in 2015 and later negate a finding that Spady had established exclusive possession by using the property for a 10-year period after its construction in 1999.

Further, even if Ben had sporadically, over the 10-year period, been on a small portion of the 1.36 acres, this would not have been sufficient to interrupt Spady's exclusive possession. In *Nye v. Fire Group Partnership*, 265 Neb. 438, 657 N.W.2d 220 (2003), the Supreme Court, when discussing exclusivity of use, noted that the adverse possessors presented evidence that they never saw the record owner on the property. Because that case involved a grant of summary judgment, the court noted that whether the record owner used a part of the tract was an issue of material fact relevant to the

determination of exclusivity. It stated that "even if [the record owner] occasionally parked machinery on the property and used part of it as a turnaround, the *frequency* of the use affects a determination of exclusivity." *Id*. at 445, 657 N.W.2d at 226 (emphasis supplied). This suggests sporadic use may be insufficient to interrupt the exclusive possession of the adverse possessor and is dependent upon the frequency of the use.

Additionally, "sporadic use, temporary presence, or permissive visits by the record owner will not defeat the exclusivity element of adverse possession." 2 C.J.S. *Adverse Possession* § 59 at 573-74 (2023). Even if Ben had sporadically used a small portion of the 1.36 acres in the manner he testified to at trial, it would not have been sufficient to interrupt Spady's exclusive possession.

### (iv) Notorious

[11-13] The acts of dominion over land allegedly adversely possessed must, to be effective against the true owner, be so open, notorious, and hostile as to put an ordinarily prudent person on notice of the fact that the lands are in adverse possession of another. *Poullos v. Pine Crest Homes*, 293 Neb. 115, 876 N.W.2d 356 (2016). If an occupier's physical actions on the land constitute visible and conspicuous evidence of possession and use of the land, that will generally be sufficient to establish that possession was notorious. *Id*. Although the enclosure of the land renders the possession of land open and notorious, it is not the only way by which possession may be rendered open and notorious. *Id*. Rather, nonenclosing improvements to land, such as erecting buildings or planting groves or trees, which show an intention to appropriate the land to some useful purpose, are sufficient. *Id*.

Here, the physical alterations to the land previously described show an intention to appropriate the land to a useful purpose. The district court described the area as "a well-manicured, beautiful pond area complete with green grass, lush beds of daylily flowers, lighting, and other improvements."

These acts and changes to the land were sufficiently notorious to put an ordinarily prudent person on notice that the lands were in the adverse possession of another, and to give notice to adjoining record owners that their title or ownership was in danger. See *Poullos v. Pine Crest Homes, supra*.

### (v) Adverse Under Claim of
### Ownership for 10 Years

The evidence established that the garage was constructed by 1990. Spady clearly adversely possessed the area with the garage for a period of more than 10 years. The pond was built in 1999 and remained until it was leveled in 2018. Sandy believed the brick pathway and koi pond were built sometime in the 1990s. At trial, Spady testified that the koi pond was still there. The evidence clearly established that Spady possessed these areas for more than 10 years.

[14] We acknowledge that Sandy testified that Spady told her he had permission from Ben's father to "clean up" the area where the pond was eventually built, but Spady disputed this. Spady testified that he thought he had purchased the property at issue, but even if mistaken, this does not defeat his claim that he adversely possessed it. Title may be acquired by adverse possession even though the claim of ownership was invalid and the occupant believed the occupant was asserting legal rights only. *Wanha v. Long*, 255 Neb. 849, 587 N.W.2d 531 (1998). The claim of adverse possession is founded upon the intent of the occupant, such intent being determined by the occupant's acts. *Id*. Intent, even though mistaken, is sufficient where the claimant occupies to the wrong line believing it to be true and even though the claimant does not intend to claim more than that described by the deed. *Id*. The possession of the occupant is not less adverse because the occupant took and had possession innocently and through mistake; it is the visible and exclusive possession with intention to possess the land occupied under the belief that it belongs to the occupant that constitutes its adverse character. *Id*. We find that Spady

established that he adversely possessed the 1.36 acres under a claim of ownership for a period of 10 years. The district court did not err in quieting title to the 1.36 acres in Spady.

### (b) Public Nuisance

The Engels assign that the district court erred in quieting title in Spady because his use of the 1.36 acres created a public nuisance that bars his adverse possession claim. They assert adverse possession cannot be obtained over a public nuisance. Their argument is premised on alleged violations of Adams County zoning regulations and Nebraska drainage statutes.

### (i) Additional Facts

The 32 Mile Creek is to the north of Spady's property and runs west to east through the Engels' and the Pugheses' property. The land between the creek and the 1.36 acre parcel is wooded and is part of the creekbed. At trial, Sandy testified that to her knowledge, the Hastings property was in a flood zone. The Pugheses offered the 2010 Adams County zoning regulations, as amended through 2016, into evidence. The district court took judicial notice of the document and directed the parties to reference the specific flood plain sections upon which they relied in their posttrial briefs. The Engels offered flood plain regulations into evidence, but the district court did not receive the exhibit.

Ben described the creek as having two different levels:

> The wooded area is where the water flows. All of that wooded area is where water flows through. It's not just the little channel that trickles when irrigation water runs through it. Most of time it's dry, and then — until the spring or irrigation starts up, and then it floods.

Ben admitted that he never needed to contact a government official to seek remedy for the "blockage of the waterway" before the demolition, nor did he recall ever telling Spady he was concerned about the diversion of water in the creek or any flooding caused by the berm around the pond.

*(ii) Analysis*

The Engels argue that the evidence showed that Spady's actions violated Adams County zoning regulations and Nebraska drainage statutes. The Engels cite to cases both in and outside of our jurisdiction that they contend stand for the proposition that one cannot obtain land by adverse possession if the land is used to maintain a public nuisance.

As it relates to the Adams County zoning regulations, the Engels argue only that the regulations require a permit to build in a flood plain and that because Spady did not obtain a permit prior to digging the pond, it was "illegal" for him to do so. Brief for appellants at 32. There is no evidence, however, that the 2010 zoning regulations were in effect in 1999 when the pond was dug. Furthermore, the Engels provide no legal authority for their implied conclusion that building without a permit required by local zoning regulations constitutes a public nuisance or precludes a party from obtaining title to the land upon which the party builds by adverse possession. Rather, they rely upon Neb. Rev. Stat. § 28-1321(2) (Reissue 2016), the general criminal nuisance statute, and Neb. Rev. Stat. § 31-221 (Reissue 2016), the statute imposing penalties for obstructing a watercourse, as support for their argument that Spady's use of the 1.36 acres constituted a public nuisance. We disagree.

Section 28-1321(2) states in pertinent part that "the obstructing or impeding, without legal authority, of the passage of any navigable river, harbor, or collection of water; . . . or unlawfully diverting any such watercourse from its natural course or state to the injury or prejudice of others; . . . shall be deemed nuisances." Section 31-221 makes it a misdemeanor for any person to "willfully fill up, injure or destroy any watercourse." The Engels assert that Spady's construction of the pond diverted the nearby creek, causing damage to their property. However, the validity of their argument rests upon proof that Spady's actions constituted diversion of a watercourse. "Watercourse" is defined as "[a]ny depression or draw

two feet below the surrounding lands and having a continuous outlet to a stream of water, or river or brook . . . ." Neb. Rev. Stat. § 31-202 (Reissue 2016).

The Engels argue that the creek at issue here is a "watercourse" because Spady testified that the creek is "probably 10 feet lower than my yard." However, this testimony is insufficient to prove the creek was a watercourse.

In *Belsky v. County of Dodge*, 220 Neb. 76, 369 N.W.2d 46 (1985), the Supreme Court determined that a landowner's failure to produce evidence that a creek met the statutory definition of watercourse was fatal to his claim seeking an injunction against the county for obstructing drainage from his farm. Although it was established that there was an adjacent creek, the record was void of the remaining elements. The court stated: "The destination of [the creek] is undisclosed. Absence of such evidence precludes any finding that [the creek] is a watercourse within § 31-202. We conclude that there is no statutory watercourse involved in the case before us." *Id.* at 81, 369 N.W.2d at 51.

Likewise, in the present case, the evidence supports the existence of a creek near the 1.36 acres; however, there is no evidence to support that the creek led to a continuous outlet as required by statute. We find the Engels failed to prove that Spady's use of the land constituted a public nuisance due to diversion of a "watercourse."

### (c) Judicial Estoppel and Issue Preclusion

The Engels assign that the district court erred in quieting title to the 1.36 acres in favor of Spady because he did not disclose ownership of the land during his divorce proceedings. They assert that the doctrines of judicial estoppel and issue preclusion now bar Spady from asserting ownership of that land. We disagree and will address each doctrine in turn.

### (i) Additional Facts

Spady testified that when he purchased the property in 1977, it was so long ago that he had no way of knowing what he

had purchased. He testified that he thought he had purchased it and owned it. An appraisal completed in 2013 for Spady's divorce proceedings indicates that the appraiser included the 1.36 acres as part of the property, noting that the property had "two ponds stocked with various fish species" and including photographs of the area.

### (ii) Analysis

[15-17] Judicial estoppel is an equitable doctrine that a court invokes at its discretion to protect the integrity of the judicial process. *Clemens v. Emme*, 316 Neb. 777, 7 N.W.3d 166 (2024). The doctrine of judicial estoppel prevents a party from taking a position inconsistent with one successfully and unequivocally asserted by the same party in a prior proceeding. See *id*. Judicial estoppel is to be applied with caution so as to avoid impinging on the truth-seeking function of the court, because the doctrine precludes a contradictory position without examining the truth of either statement. *Id*. Before a court may apply the judicial estoppel doctrine, bad faith or an actual intent to mislead on the part of the party asserting inconsistent positions must be demonstrated. See *id.*

The Engels argue that during Spady's divorce proceedings, he should have disclosed any interest he had in the 1.36 acres, and that he failed to do so. Thus, they argue, he cannot claim it now. However, as noted above, there must be bad faith or an actual intent to mislead demonstrated on the part of the party asserting inconsistent positions. The Engels make no such assertion.

Based on the evidence cited above, Spady appeared to believe at the time of his divorce that the Hastings property included the 1.36 acres and the Hastings property was awarded to him in the divorce. Upon discovering that this 1.36 acres was not included in his property, he filed this action to quiet title. The district court did not err in concluding that judicial estoppel did not preclude it from quieting title to the 1.36 acres in Spady.

[18] The Engels also assign that the district court erred in quieting title to the 1.36 acres in Spady because Spady is barred by the doctrine of issue preclusion from asserting ownership in the 1.36 acres. Issue preclusion, also referred to as collateral estoppel, applies where (1) an identical issue was decided in a prior action, (2) the prior action resulted in a final judgment on the merits, (3) the party against whom the doctrine is to be applied was a party or was in privity with a party to the prior action, and (4) there was an opportunity to fully and fairly litigate the issue in the prior action. *Fraternal Order of Police Lodge #88 v. State*, 316 Neb. 28, 3 N.W.3d 82 (2024).

We find the final factor to be dispositive and do not address the other factors. In the divorce proceeding between Spady and Sandy, there was not an opportunity to litigate a quiet title action that involved third parties. As such, issue preclusion does not apply in this case. The district court did not err in determining that issue preclusion did not prevent it from quieting title to the 1.36 acres in Spady.

### (d) Damages in Excess of Market Value

The Engels assign that the district court erred in awarding Spady damages that were in excess of the market value of the 1.36 acres. They argue that the Supreme Court's decision in *Keitges v. VanDermeulen*, 240 Neb. 580, 483 N.W.2d 137 (1992), precludes Spady from recovering more than the market value of the land immediately preceding the damage, and that *Russell v. Franklin County*, 27 Neb. App. 684, 934 N.W.2d 517 (2019) (*Russell I*), limits recovery to the market value of the 1.36 parcel. We disagree.

[19,20] The Supreme Court has previously stated that in determining the proper measure of damages, "'where the land damaged can be returned to its prior condition by treatment, grading, or otherwise, the damage is temporary and the landowner is entitled to such expenses as part of his or her damages.'" *Keitges v. VanDermeulen*, 240 Neb. at 589, 483

N.W.2d at 143, quoting *Kula v. Prososki*, 228 Neb. 692, 424 N.W.2d 117 (1988). The court explained:

> One person's unsightly jungle may be another person's enchanted forest; certainly the owner of such land should be allowed to enjoy it free from a trespasser's bulldozer. Indeed, a trespasser should not be allowed, with impunity, to negligently or willfully wreak havoc on a landowner's natural woods, and the landowner's attempted recovery for such injury should not be entirely frustrated by the fact that the market does not reflect his personal loss.
>
> Thus, we hold that in an action for compensatory damages for cutting, destroying, and damaging trees and other growth, and for related damage to the land, when the owner of land intends to use the property for residential or recreational purposes according to his personal tastes and wishes, the owner is not limited to the difference in value of the property before and after the damage or to the stumpage or other commercial value of the timber. Instead, he may recover as damages the cost of reasonable restoration of his property to its preexisting condition or to a condition as close as reasonably feasible. However, the award for such damage may not exceed the market value of the property immediately preceding the damage.

*Keitges v. VanDermeulen*, 240 Neb. at 589-90, 483 N.W.2d at 143.

Based on *Keitges*, Spady is entitled to reasonable restoration damages, limited by the market value of the property immediately preceding the damage. See, also, *"L" Investments, Ltd. v. Lynch*, 212 Neb. 319, 322 N.W.2d 651 (1982). The Engels argue that Spady's restoration damages are capped by the fair market value of the 1.36 acres as determined by the Pugheses' appraiser. They contend that "[u]nder the *Keitges* rule, this is the maximum cap on damages . . . Spady can recover for damage to his real estate and fixtures." Brief for appellants at 39. They rely upon dicta contained in *Russell I, supra*, in support of this limitation.

In *Russell I*, the plaintiffs filed an inverse condemnation case after the county removed trees from their property. The district court granted summary judgment in favor of the county, determining that the proper measure of damages was the diminution in value of the land after the taking and awarded plaintiffs that amount. *Id*. On appeal, a majority of this court affirmed. *Id.* In rejecting plaintiffs' argument that they were entitled to the costs of restoring the trees taken, the majority noted that the damages sought exceeded the fair market value of the property. In making this determination, the majority observed that plaintiffs sought recovery for replacing trees on a parcel of land that comprised approximately 1 percent of their entire property. It determined, in dicta, that even if the cost of restoration was the proper measure of damages, the damages sought exceeded 1 percent of the value of the entire tract. It ultimately determined that the proper measure of damages was the difference in the fair market value of the land before and after the taking and affirmed the district court's grant of summary judgment in favor of the county, which limited plaintiffs' damages to that amount. *Id*.

On further review, the Supreme Court affirmed the result reached by this court. It concluded that the plaintiffs in *Russell I* were not entitled to restoration damages, but instead were limited to diminution in market value damages. See *Russell v. Franklin County*, 306 Neb. 546, 946 N.W.2d 648 (2020) (*Russell II*). Based on expert testimony received at the summary judgment hearing, the court affirmed the district court's order granting the county's motion for summary judgment and awarding the plaintiffs damages of $200. *Id*. A review of *Russell I* reveals that the diminution in value of $200 was derived at by determining the value of the "entire property before the taking" and subtracting from that amount the property's value after the taking. See *Russell I*, 27 Neb. App. at 687, 934 N.W.2d at 520.

Following the rationale of utilizing the change in value of the entire tract when determining diminution in value, we

conclude that limiting the fair market value of the Spady property to the value of the 1.36 parcel over which he obtained ownership by adverse possession would be erroneous. The evidence supports that the 1.36 acres was a contiguous extension of the land Spady purchased and upon which he built his home. The 2013 appraisal conducted in conjunction with Spady and Sandy's divorce described the property as having "extensive landscaping. There are two ponds well stocked with various fish species. There are many tree and flower plantings. The 32 Mile Creek flows through the property." The photographs incorporated in the appraisal include the 1.36 acres. Based on this appraisal, and testimony from Johnson and Ahlers that Spady's backyard appeared to be one contiguous piece of land that included the pond and surrounding areas, we see no reason to isolate this small parcel from the rest of Spady's property when determining its market value.

We find further support for our decision in the Restatement (Second) of Torts § 929 (1979). Although addressing diminution in value, its comment states that "[i]f only a portion of the tract of land has been directly harmed, the diminished value of the entire tract is considered." *Id.*, comment *a*. at 545. Another comment explains that "when a garden has been maintained in a city in connection with a dwelling house, the owner is entitled to recover the expense of putting the garden in its original condition even though the market value of the premises has not been decreased by the defendant's invasion." *Id.*, comment *b*. at 546. In these examples, the land that has been damaged is not isolated from the property as a whole.

The Supreme Court has stated that § 929 is consistent with its decision in *"L" Investments, Ltd. v. Lynch*, 212 Neb. 319, 327, 322 N.W.2d 651, 656 (1982), quoting *Schiltz v. Cullen-Schiltz & Assoc., Inc.*, 228 N.W.2d 10 (Iowa 1975), wherein that court stated:

> "[T]he principle underlying allowance of damages is to place the injured party in the same position, so far as money can do it, as he would have been had there been

no injury or breach of duty, that is, to compensate him for
the injury actually sustained . . . .

. . . .

"Where the injury is such that the premises may be
restored to as good condition as it was before, the mea-
sure of recovery is the fair and reasonable cost and
expense of such restoration."

Here, Spady's property was one contiguous parcel that
included his home, the garage, the landscaped area, the brick
pathway, the koi pond, and the pond that was eventually
destroyed. Under *Keitges v. VanDermeulen*, 240 Neb. 580, 483
N.W.2d 137 (1992), Spady may recover the cost of reason-
able restoration to the land's preexisting condition, or as close
as possible, and evidence related to the land's diminution in
value has no relevance. However, the award for such damage
may not exceed the market value of the property immediately
preceding the damage. See *id*. As explained above, we con-
clude the market value is not limited to the 1.36 acres, but,
rather, includes the whole of the Spady property.

The most recent appraisal introduced at trial was conducted
by an appraiser hired by the Pugheses' counsel. In August
2022, the appraiser determined that Spady's property had a
value of $1 million and that this was the value both before
and after the destruction of the pond. Using this appraisal, the
value of the property prior to the pond's destruction was $1
million; therefore, Spady could not be awarded more than that
amount to restore the land to its condition prior to the damage.
Here, the district court awarded Spady total restoration dam-
ages of $60,095. This being less than the fair market value of
the property prior to the pond's destruction, the district court
did not err in its award of damages.

### 2. SPADY'S CROSS-APPEAL

#### (a) Knowledge of Pond's Condition

Spady assigns that the district court erred in finding that it
needed to know the exact condition of the 1.36 acres at the

time of leveling. He argues that because the Engels chose to level the pond with no warning, they should bear the burden of proving the exact condition of the property. He further argues that he provided evidence that the 1.36 acres was in good or very good condition almost to the day of the leveling through photographs and testimony of the lawn care worker who maintained the yard. The district court noted that it was unable to award costs related to replacement of vegetation and reconstruction of the pond because it did not know "the exact condition of the disputed property at the time" it was destroyed. Although the district court did not need to know the *exact* condition of the property, it did need to know its general condition in order to determine whether the costs requested were true restoration costs.

Although Spady provided several photographs that showed a beautiful, landscaped pond and surrounding area, he could only identify the timeframe of the photographs as after the pond was constructed, and possibly before 2015. Conversely, the Engels and the Pugheses provided photographs that were taken much closer in time to the leveling of November 2018, which photographs showed an empty hole with vegetation growing in it, an exposed liner with some rips, and railroad ties.

Spady argues that the burden of proof as to the property's condition should have been on the Engels because they "chose to do this without any forwarning [sic]." Brief for appellee at 29. But damages are an element of a plaintiff's cause of action. See *Bedore v Ranch Oil Co.*, 282 Neb. 553, 805 N.W.2d 68 (2011). The evidence adduced by the Engels and the Pugheses contradicted Spady's evidence of the pond's condition. Given the conflicting evidence of the property's condition, we find no error in the court's refusal to award damages for vegetation replacement and pond reconstruction.

### (b) Witness Testimony

Spady assigns that the district court erred in disregarding the testimony from two of his witnesses, Stromer and Johnson.

Both witnesses prepared bids for the cost to clean the debris and to rebuild the pond. Spady argues that their testimony regarding the cost of restoring the property to what Spady said was its former condition was uncontradicted.

As set forth above, the district court refused to award damages to restore the pond because it was unable to determine its condition at the time of destruction. We found no error in that regard. Consequently, the court did not err in denying Stromer's and Johnson's estimates for restoration of the pond. We note the court awarded damages for the cleanup and disposal of the railroad ties and liner and utilized Johnson's estimate of $55,100, which exceeded that of Stromer's estimate of $41,500.

### (c) Electrical Damages

Spady assigns that the district court erred in failing to find that elements of the electrical damages were in evidence.

### (i) Additional Evidence

As it related to the electrical aspect of the 1.36 acres, Spady described that there were light poles around the lake. Spady testified that after the leveling of the pond, the electricity in the koi pond area and other areas of the yard would not work; he stated that the lines had been cut and everything was unhooked. Spady confirmed that there was electrical work in the 1.36 acres that was temporary in nature, including the use of extension cords. Spady agreed that in his deposition, he had stated that the only electrical work that he knew where there would have been inspectors was his gazebo area, because some of the lighting was only temporarily installed. He testified, however, that the light poles were permanently installed.

Spady provided the testimony of two electricians who provided estimates for the electrical work to be performed on the pond area. One electrician testified that his bid would be to replace everything up to code, but he did not know if the electrical work that had previously been installed had been up to code. The other electrician had never seen the area prior to

the leveling; rather, Spady provided much of the information. The bid was based on the scope of the electrical work that Spady described, along with the electrician's visit to the site.

### (ii) Analysis

Spady argues that two independent experts provided estimates of fair and reasonable costs to restore damaged electrical components to their former conditions. Spady argues the Engels did not offer evidence to contradict this evidence. However, Spady's evidence as to the electrical costs suffers from the same shortcoming as his request for pond restoration damages. The district court found that although the Engels and the Pugheses should pay the cost of damages to the electrical system, Spady had failed to prove the necessary elements related to the damage to the electrical system.

It is unclear from this record what type of electrical system was in place in and around the 1.36 acres prior to the leveling. Spady is entitled to recover the cost to repair or replace the damage done by the trespass, but he is not entitled to the cost of improving or upgrading what was damaged. To determine the extent of that damage, the district court first needed to know what type of electrical system existed before the leveling. There was little information presented regarding the electrical system in place prior to the leveling. For example, light poles were undisputedly erected around the pond, but there were wires hanging from trees around the area. Spady admitted much of the electrical work was temporary and that the only inspected area would have been around the gazebo. The estimates offered at trial were for permanent and code-compliant work. We find no error in the district court's refusal to award damages for electrical work that enhanced, rather than replaced, the existing electrical work.

### (d) Loss of Use and Enjoyment

Spady assigns that the district court erred in failing to award him damages for his loss of use and enjoyment in the 1.36 acres due to the leveling of the pond area. Spady's complaint

alleged that a private nuisance was created because destroying the pond reverted the area back into a low-lying wet area that harbored mosquitos and weeds and that burying the railroad ties created a new nuisance on Spady's property. The district court found for Spady on this claim, but did not award additional damages. The district court stated that the damages awarded on this claim would be duplicative, as they related to the actual damage done to the property, and that no specific request or evidence as to any other theory of recovery was presented to justify an award.

The district court determined that upon proof of sufficient evidence, the Engels and the Pugheses would be liable under a trespass theory for the costs to replace the sprinkler and irrigation system, replace the electrical system, clean up, replace the vegetation, and reconstruct the pond, but limited recovery to the pond cleanup and sprinkler and irrigation system repair due to the lack of proof by Spady.

Although Spady asserted a claim for loss of use, he did not attempt to quantify a value for this claim at trial, nor did he present evidence of the extent he currently used the property. See *Russell II, supra* (observing that no loss of use damages were identified by parties). Evidence was presented that during his marriage to Sandy, the couple would host social events and fundraisers, but the marriage ended in 2015. Given Spady's testimony that he was at the Hastings property only approximately 2 months a year and the absence of any evidence as to activity on the land since Spady regained possession of the property in 2015, we find no error in the district court's refusal to award additional damages on this claim.

## VI. CONCLUSION

We find that the district court did not err in quieting title in the 1.36 acres in Spady, nor did it err in its award of damages. We therefore affirm the judgment of the district court.

AFFIRMED.